Revised May 15, 2003

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 01-50510
_____


UNITED STATES OF AMERICA,

                              Plaintiff-Appellee,

          V.

JOSE GERARDO MENDOZA-GONZALEZ,

                              Defendant-Appellant.

_____

Appeal from the United States District Court
      for the Western District of Texas
_____

January 10, 2003

Before DAVIS, SMITH, and BENAVIDES, Circuit Judges.

BENAVIDES, Circuit Judge:

                    I.    Background

     On May 8, 1998, Jose Gerardo Mendoza-Gonzalez ("Mendoza"),

the appellant, drove up to a permanent immigration checkpoint

along Interstate 10, approximately four miles west of Sierra

Blanca, Texas.  United States Border Patrol Agent Reynaldo Ramos

("Ramos") was on duty checking the citizenship of the occupants

of the vehicles passing through.  Three days prior, over twenty

illegal aliens had been found inside a truck bearing the logo

                            -1-

"Mesilla Valley Transportation" at another checkpoint in the same sector. Ramos had been instructed to be on the look-out for similar trucks. As Mendoza approached the checkpoint, Ramos noticed the Mesilla Valley name on the exterior of the truck.

Ramos stopped Mendoza, and asked him a series of brief questions regarding his citizenship and cargo. Mendoza replied that he was a resident of the United States, a citizen of Mexico, and was hauling cheese. Although he spoke coherently in English, his voice was shaky and he did not look at Ramos throughout the questioning. Mendoza's nervous demeanor and suspicious vehicle prompted Ramos to ask if he could "take a look in the back" of the trailer. Mendoza replied, "Okay," and pulled into the secondary inspection area.

At the secondary inspection area, Agent Leonardo Lopez ("Lopez"), a ten-year veteran of the Border Patrol, emerged from inside the checkpoint as Mendoza stepped down from his truck. Lopez examined Mendoza's bill of lading[1] and inquired as to his citizenship and cargo.[2] Mendoza responded that he was a resident alien and that he was transporting cheese. Lopez than asked if he could "take a look" inside the trailer. Mendoza assented and

---

[1] A bill of lading is "a receipt given by a carrier for goods accepted for transportation." Random House College Dictionary 134 (1980).

[2] At oral argument, defense counsel questioned the consistency of Lopez's testimony regarding his encounter with Mendoza. On direct examination, Lopez only described the portion of the conversation where he asked Mendoza for consent. He provided a more detailed version of their encounter on cross examination, at defense counsel's request. We find the two versions entirely consistent, and the district court implicitly found Lopez credible. We therefore rely upon his entire testimony.

opened the rear doors.  As Mendoza latched the doors to the side of the truck, Lopez asked if him if he had any passengers.  Mendoza said, "No."  Lopez then requested permission to look inside of the cab of the truck.  Mendoza said, "Sure.  Go ahead."  After checking the cab, Lopez returned to the rear of the trailer and climbed inside.

An array of mostly white boxes were inside the trailer.[3]  The white boxes were "mummified" with cellophane wrapping and lay on top of pallets.  On top of the white boxes were a few 24" X 18" X 18" brown cardboard boxes, each with a piece of clear tape over the top and labeled "Ryder Rental Trucks."[4]  Due to their different appearance, Lopez became suspicious of the brown boxes.  Using a pocketknife, he sliced the tape on one of the boxes and opened it to reveal rectangular bundles wrapped in clear, grease-stained cellophane.  Lopez immediately recognized the packages to be bricks of marijuana.  He cut just enough from one of the bricks to reveal a green, leafy substance.  Ramos arrested Mendoza as Lopez took one of the bricks inside the checkpoint for

---

[3]The district court stated in its findings that the boxes were located in the cab of the truck.  It is evident from the record that after searching the cab, Agent Lopez returned to the trailer, found the boxes and then executed the search that is the subject of this appeal.

[4]There was some confusion at oral argument regarding the quantity of tape over the top of the brown cardboard boxes.  In its findings, the district court stated that the boxes "had tape on them."  At the suppression hearing, Agent Lopez testified that the box he opened had "just a piece of Scotch tape or just clear tape on it."  This was the only evidence the court received regarding the manner in which the box had been closed, and Mendoza has not disputed the agent's testimony.  The district court's findings clearly gave credence to Agent Lopez's testimony, and we therefore conclude that over the top of each box was a single piece of clear or Scotch tape.

a field test.  The field test confirmed the agents' suspicions. In all, Mendoza had been transporting over 150 kilograms of marijuana.

Mendoza filed a motion before the district court to suppress the marijuana discovered in the boxes as fruit of an illegal search in violation of the Fourth Amendment.  The court conducted a pre-trial hearing, and denied the motion.  Subsequently, the court held a bench trial and convicted Mendoza of knowingly possessing marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1999).  He was originally sentenced to a prison term of 96 months, followed by four years of supervised release.  After the parties filed their briefs with this court, at the behest of the Government the district court reduced Mendoza's sentence to 30 months in prison.  The court did not alter the term of supervised release.  We granted Mendoza's motion to supplement the record with the district court's amended sentence.

## II.  Motion to Suppress

Mendoza appeals the district court's denial of his motion to suppress.  It is well established that Border Patrol agents stationed at a permanent checkpoint site may stop a vehicle, question its occupants about citizenship, and conduct a visual inspection of the vehicle without any individualized suspicion that the car or its occupants are involved in criminal activity. *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-62, 96 S.Ct.

-4-

3074, 49 L.Ed.2d 1116 (1976).

The Fourth Amendment, however, prohibits a search of the vehicle in the absence of a warrant, with only two exceptions. *United States v. Ross*, 456 U.S. 798, 809, 102 S. Ct. 2157, 72 L. Ed. 2d 572 (1982); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973). The agents must have either the consent of the owner to conduct the search or probable cause to believe that the vehicle contains contraband or other evidence of a crime. *Id.* The appellant argues that the district court erred in denying his motion to suppress because there was neither probable cause nor consent to open the boxes found in the trailer of his truck. Because we find that the search fell within the scope of Mendoza's consent, we affirm the district court's ruling and do not address whether the agents conducted the search with probable cause.

*A. Standard of Review*

We review the district court's decision to deny the motion to suppress in the light most favorable to the prevailing party, the government. *United States v. Hernandez,* 279 F.3d 302, 306 (5th Cir. 2002). The district court's conclusions of law are subject to *de novo* review, but factual findings are reviewed only for clear error. *United States v. Valdez*, 267 F.3d 395, 397 (5th Cir. 2001). The scope of consent is a question of law. *United States v. Rich*, 992 F.2d 502, 505 (5th Cir. 1993). However, the factual circumstances surrounding the consent may be instructive.

-5-

"[W]here the judge bases a finding of consent on the oral testimony at a suppression hearing, the clearly erroneous standard is particularly strong since the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Davis*, 61 F.3d 291, 299 (5th Cir. 1995) (quoting *United States v. Kelley,* 981 F.2d 1464, 1470 (5th Cir. 1993)).

B.    *The Scope of Consent*

Mendoza does not dispute the district court's finding that he consented to the agents' requests to "look in" the truck. Instead, he argues that the search of the cardboard box inside of the trailer exceeded the scope of his consent.

1.

When the government relies upon consent as the basis for a warrantless search, "they have no more authority than they have apparently been given by the consent."  Wayne R. LaFave, *Search and Seizure* § 8.1(c) (3d ed. 1996 & Supp. 2003).  Under the Fourth Amendment, "[t]he standard for measuring the scope of a suspect's consent...is that of 'objective' reasonableness--what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S. Ct. 1801, 1803-04, 114 L. Ed. 2d 297 (1991).  "The question is *not* to be determined on the basis of the subjective intentions of the consenting party or the subjective interpretation of the searching officer."  LaFave, Search & Seizure § 8.1.  Although objective reasonableness is a

question of law, the factual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given. *See United States v. Ibarra*, 965 F.2d 1354, 1357 (5th Cir. 1992) (*en banc*) (7-7 decision).[5]

The terms of the search's authorization were simple.  At the initial inspection area, Ramos asked Mendoza if he could "take a look in the back."  Mendoza replied simply, "Okay."  At the secondary inspection area, when Lopez asked Mendoza if he could "take a look" inside the trailer, Mendoza said, "Yes." Law enforcement officials are not required to separately request permission to search each container within a vehicle for which they have received consent to search.  *Jimeno*, 500 U.S. at 252. Mendoza chose not to place any explicit limitations in his response to their general request, which, in this Circuit, is evidence of general consent.  *See United States v. Crain,* 33 F.3d 480, 484 (5th Cir. 1994).  As we have stated in the past, "the defendant, as the individual 'knowing the contents of the vehicle,' has the 'responsibility to limit the scope of the consent.'"  *United States v. McSween*, 53 F.3d 684, 688 (5th Cir. 1995)(quoting *Rich,* 992 F.2d 502, 507 (5th Cir. 1993)).  At the time Mendoza consented to a search of the trailer, he knew that the brown cardboard boxes contained marijuana.  "'[I]f he deemed

---

[5]Decisions by an equally divided en banc court have no value as binding precedent.  *United States v. Knutson,* 113 F.3d 27, 28 (5th Cir. 1997).  We nonetheless find the reasoning of *Ibarra* persuasive.

it necessary to do so,'" he should have limited his consent "to clarify any ambiguity from which he now seeks to benefit." *Id.* The fact that Mendoza did not object when Lopez actually began to open the box provides additional evidence that the agent's actions were within the scope of initial consent.[6] *McSween*, 53 F.3d at 688; *United States v. Cannon*, 29 F.3d 472, 477 (9th Cir. 1994).

Mendoza further argues that a reasonable person would have assumed he had consented to only a quick look inside of the trailer, rather than a search of the containers within, because this is what Ramos had (1) literally requested; and (2) actually done after receiving permission to "take a look" inside the cab area. We first note that it is established law in this Circuit, and others, that a request to "look in" a vehicle is the equivalent of a request for general consent to search. *McSween*, 53 F.3d at 688; *Crain*, 33 F.3d at 484; *Rich*, 992 F.2d at 506.[7]

---

[6]Defense counsel contends that Mendoza may not have been able to see Ramos open the box, and was therefore not in a position to object. This is a purely hypothetical argument. We have been unable to find any evidence in the record to support the contention that the box was opened outside of Mendoza's line of sight. Moreover, this argument has been made, and rejected, in the past. "We are unwilling to read *Jimeno* to hold ... that enforcement officials must conduct all searches in plain view of the suspect, and in a manner slowly enough that he may withdraw or delimit his consent at any time during the search." *McSween*, 53 F.3d at 688 (quoting *Rich*, 992 F.2d at 507).

[7]*See, e.g., United States v. Gant,* 112 F.3d 239, 242-43 (6th Cir. 1997) (quoting *Rich,* 992 F.2d at 506, for the proposition that "'any words...that objectively communicate to a reasonable individual that the officer is requesting permission to [conduct a search] constitute a valid search request' for Fourth Amendment purposes."); *United States v. Harris,* 928 F.2d 1113, 1117 (11th Cir. 1991) (search of container found in trunk of vehicle after permission given to "look" in vehicle held to be within the scope of consent); *United States v. Boucher*, 909 F.2d 1170, 1174-75 (8th Cir. 1990) (consent to "look in" defendant's vehicle included permission to thoroughly search the vehicle and did not limit the officer to a "cursory look through the windows"); *United States v. Espinosa,* 782 F.2d 888, 892 (10th Cir. 1989)

Second, Lopez requested and received permission to search the trailer *before* he searched the cab of the truck. It is therefore impossible that Mendoza relied upon the way that Lopez searched the cab as an illustration of what he was agreeing to when he consented to a search of the trailer.

2.

The scope of a consent search may also be limited, if not by the suspect, by the stated object of the search. *Jimeno,* 500 U.S. at 251. In *Jimeno*, the defendant was pulled over in his vehicle for a traffic violation. The officer told Jimeno that he suspected that he was carrying narcotics, and then asked for permission to search the car. Jimeno consented, and the officer discovered cocaine inside of a folded, brown paper bag that had been placed on the floorboard of the vehicle. The Supreme Court held that a reasonable objective person would have concluded that Jimeno's general consent included permission to search containers within the car that could conceivably contain drugs, such as the paper bag. *Id.* at 249-51.

Mendoza contends that when he agreed to allow the trailer to be searched, he did so because the questions asked by the agents led him to believe that they were solely interested in looking for illegal aliens, who could not have been hidden inside a 24" X 18" X 18" cardboard box. *See United States v. Muniz-Melchor,* 894

_____

(concluding that defendant's consent to officer's request to "look through" defendant's automobile authorized officer to conduct thorough search of vehicle).

-9-

F.2d 1430, 1437 (5th Cir. 1990) (noting that searches at checkpoints for illegal aliens are limited to compartments large enough to hold a person). However, the exchanges between the appellant and the agents support a consensual search of broader dimensions.

The agents do not deny that they initially suspected that Mendoza was transporting illegal aliens. Over twenty illegal aliens had been found inside a similar truck at another checkpoint in the same geographic area just three days earlier. However, the primary inquiry in determining the scope of consent is what a reasonable, objective, third party observer would have understood the suspect had consented to -- not the subjective intent of the enforcement officer. LaFave, Search and Seizure § 8.1(c). The agents did not tell Mendoza what they expected to find during the course of a search, nor would their questions have lead a reasonable observer to believe that they were solely interested in eliminating the possibility that he was transporting people.

At the primary inspection area, Agent Ramos asked Mendoza his citizenship, and then asked him what he was hauling. Mendoza replied that he was a Mexican citizen and was carrying cheese. At the secondary inspection area, as Agent Lopez walked with Mendoza to the back of the trailer, Lopez asked Mendoza his citizenship and what he was transporting. Again, Mendoza responded that he was a resident alien and that he was carrying

cheese.  Then Lopez said, "Well, can we take a look?" and Mendoza replied, "Yes."  At the time that Mendoza gave his consent to search the trailer, an objective observer would not be able to specify a particular object of the search.  Rather, the onlooker would understand that the agents wanted to confirm that Mendoza was indeed carrying nothing but cheese.  The fact that *after* Lopez received consent to search the trailer he asked Mendoza if he had any passengers or a co-driver does not change this conclusion.  The agents never voiced their suspicion that Mendoza was smuggling aliens, but rather asked a series of questions that would lead a reasonable observer to believe that they were interested in the contents of the truck generally.  Considering the conversations *in toto*, an objective, specifically that of confirming the absence of people, was not sufficiently delineated by the agents when they sought consent to constrain them in their search.  Mendoza gave general consent to a general request to search the trailer.

### 3.

When a search is premised upon a general, limitless statement of consent, enforcement officers do not have carte blanche over the domain where consent was given.  The reasonableness superstructure of the Fourth Amendment still applies, and demarcates the outer bounds of a consensual search.  *Ibarra*, 965 F.2d at 1358.  The question then becomes whether it was reasonable to interpret Mendoza's general oral consent to

search the trailer as authority to open a cardboard box, closed shut with a piece of tape, located inside. *See McSween,* 53 F.3d at 688. Mendoza contends that it was not. We disagree.

This Circuit has already addressed the situation where enforcement officers interpret a grant of general consent to search a vehicle as encompassing the containers located within. *See Crain*, 33 F.3d 480. In *Crain,* this court was faced with circumstances virtually identical to those the Supreme Court encountered in *Jimeno*, with the exception that Crain had not been told that the officers were interested in searching for narcotics. *See Jimeno,* 500 U.S. at 249-50; *Crain,* 33 F.3d at 483. Crain and his vehicle had been stopped by law enforcement officers for speeding. 33 F.3d at 482. Without stating expressly or by implication what they expected a search of his vehicle to uncover, the officers asked Crain for consent to look inside his car. Crain agreed. *Id.* at 483. During the search, one of the officers found a twisted and rolled up brown paper bag lodged underneath the driver's seat. *Id.* He opened the bag to reveal a whitish rock substance that later proved to be crack cocaine base. *Id.* Relying on *Jimeno,* we affirmed the district court's decision to deny a motion to suppress and held that Crain's general consent to an open-ended request to search the vehicle reasonably extended to a paper bag jammed underneath the seat. *Id.* at 484. The fact that the officers did not particularize an objective when the sought consent did not limit

the search's scope beyond that which the Supreme Court had previously deemed reasonable in *Jimeno*.

The Second Circuit has also concluded that the fact that the defendant was not informed of the purpose of the search does not affect the reasoning of *Jimeno. See United States v. Snow*, 44 F.3d 133, 135 (2d. Cir. 1995). In *Snow,* it was held that:

> [T]he defendant did not–and probably could not–know what the officer was looking for does not change our view of his consent. It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers. If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.

*Id.* at 135. The First Circuit has reached a similar conclusion. *See United States v. Zapata*, 18 F.3d 971, 977-78 (1st Cir. 1994) (holding that general consent to search a vehicle, granted without the defendant's knowledge of the search's object, extended to a zipped duffel bag found in the trunk of the vehicle). Although the scope of a search is generally defined by its expressed object, an object need not have been specified if the circumstances could otherwise lead a reasonable person to conclude that the search might include the container at issue. *McSween*, 53 F.3d at 688. As discussed earlier, we believe a reasonable person privy to the conversations that took place between Mendoza and each of the Border Patrol Agents would believe that Mendoza's consent to search the trailer included

permission to open a brown cardboard box located inside of it. As previously noted, Mendoza did not object as Agent Lopez opened one of the brown cardboard boxes. "A failure to object to the breadth of the search is properly considered an indication that the search was within the scope of the initial consent." *Id.*

4.

The parties have invested significant energy into debating whether the brown boxes were "closed" or "sealed," and whether they were more akin to "locked" or "unlocked" containers. In *Jimeno*, the Court held that "consent to search a vehicle may extend to *closed* containers found inside the vehicle." 500 U.S. at 250 (emphasis added). It specifically noted an exception, however, stating in dicta that "[i]t is very likely unreasonable to think that a suspect, by consenting to the search of his trunk, has agreed to the *breaking* open of a *locked briefcase* within the trunk." *Id.* at 251-52 (emphasis added).

Mendoza contends that because the boxes were taped shut, they were similar to a locked or sealed container, and their search was therefore presumptively unreasonable. The government responds that a box, kept shut by a single piece of tape, is necessarily more like a closed, but unlocked container whose search the Supreme Court condoned in *Jimeno.* We decline to engage in an unnecessary semantic debate over the closed vs. sealed distinction. The dictionary definition of "seal" is "to close or make secure against access, leakage, or passage by a

-14-

fastening or coating."  The definition of "close" is "to bring or bind together the parts or edges...."  Merriam-Webster Collegiate Dictionary (2002).  Neither of these definitions creates much of a distinction between the two words, and therefore do not justify their use as categories in which to pigeonhole the brown cardboard box in this case.  They are an even less appropriate pivot upon which the question of a consensual search's legality should turn.[8]  The distinction has not yet achieved legal significance, and we decline to recognize it at this time.[9]  In this case, where the district court made no findings on the issue, we find that the fundamental values that drove the Supreme Court to distinguish a locked briefcase from a twisted paper bag to be a sufficient guide in determining whether the search at issue was reasonable.

---

[8]The distinction is so indeterminate that a single container has been described by one circuit as "sealed" and by another as "closed."  In *United States v. Springs,* the D.C. Circuit affirmed the district court's refusal to suppress the drugs located inside a baby powder container found during the course of a consensual search of the defendant's tote bag.  936 F.2d 1330 (D.C. Cir. 1991).  In the course of its opinion upholding the search of a can of vegetable protein found during a consensual search of the defendant's luggage, the Third Circuit referred to the baby powder container at issue in *Springs* as a "*sealed*" container.  *See United States v. Kim,* 27 F.3d 947, 957 (3d Cir. 1994) (emphasis in original).  In an opinion approving the search of taped juicer boxes found within the defendant's luggage, the Seventh Circuit referred to the same baby powder container at issue in *Springs* as a "closed" container.  *See United States v. Maldonado,* 38 F.3d 936, 941 (7th Cir. 1994).


[9]    In recounting the procedural history of the case, the Supreme Court, in *Jimeno,* quoted the earlier opinion of the Florida Court of Appeals which equated the twisted paper bag at issue to a "sealed container."  500 U.S. at 250.  This is the only instance where the Court has used the term "sealed" in this context.
    This court used the word "sealed" liberally throughout both opinions in *United States v. Ibarra* as descriptive of a characteristic that, if applicable to a compartment or object opened during the course of a consent search, would render that portion of the search illegal.  965 F.2d 1354, 1355-56, 1358, 1362 (5th Cir. 1992) (*en banc*) (7-7).

The Supreme Court likely differentiated between a reasonable and unreasonable search of a container premised upon general consent to search the vehicle in which it was found by the varying impact that such a search has upon two interests: (1) the owner's expectation of privacy as demonstrated by his attempt to lock or otherwise secure the container; and (2) the owner's interest in preserving the physical integrity of the container and the functionality of its contents. *See United States v. Ross,* 456 U.S. 798, 826 (1982)(Powell, J., concurring); *Jimeno,* 500 U.S. at 251-52; *United States v. Muniz-Melchor,* 894 F.2d 1430, 1434 (5th Cir. 1990); *Ibarra*, 965 F.2d at 1360.

Mendoza's expectation of privacy with regard to the brown cardboard boxes did not rise to the level of that evidenced by a locked container. Locked containers require specific knowledge of a combination, possession of a key, or a demonstration of significant force to open. *See United States v. Springs*, 936 F.2d 1330, 1334 (D.C. Cir. 1991); *United States v. Kim,* 27 F.3d 947, 957 (3d Cir. 1994). The boxes at issue in this case were located inside the trailer of a commercial vehicle and could be easily opened by removing or cutting through a single piece of tape.[10] A single piece of tape is commonly used on a cardboard box not to send any particular message of privacy, but rather to keep the stiff side flaps closed to prevent the contents from

---

[10]Although Agent Lopez had a pocketknife with him which he used to cut the piece of tape over the top of the box, there was no evidence presented to indicate that the use of a knife was actually necessary to open the box.

spilling out and being damaged during transit.  The box was not marked with the word "private," placed underneath two pieces of heavy luggage, or otherwise sent out a message to curious eyes that its owner placed particular importance upon the privacy of its contents.  *See United States v. Ross,* 456 U.S. 798, 822 n. 30 (1982).  An objective appraisal of all of the circumstances surrounding the search of the cardboard box indicates that Mendoza's apparent expectation of privacy regarding its contents did not rise to the level of making its search unreasonable under the Fourth Amendment.

Nor did Agent Lopez damage the box, render it useless, or endanger its contents during the course of the search.  *See Jimeno,* 500 U.S. at 251-52 (describing as "likely unreasonable" the "*breaking* open of a locked briefcase" (emphasis added)); *Ibarra,* 965 F.2d 1354 (deeming unreasonable search where agents used sledgehammer to smash open securely boarded-up attic); *United States v. Strickland,* 902 F.2d 937 (11th Cir. 1990) (holding that slashing open a spare tire found inside the trunk of the defendant's vehicle exceeded the reasonable scope of consent).

Mendoza relies particularly upon our decision in *United States v. Ibarra,* where a split en banc court affirmed the panel's decision to suppress evidence found within the boarded-up attic space of a house which law enforcement officers had obtained simple consent to search.  965 F.2d 1354.  In *Ibarra,* we

accepted the district court's finding that in using a sledgehammer to remove the well-secured boards that covered the attic entrance, the "agents engaged in flagrant structural demolition of the premises." *Id.* at 1355, 1357. *Ibarra,* however, is distinguishable from the case at hand in two key respects. First, the cardboard box is an entity independent of the compartment (in this case, a vehicle) in question. In *Ibarra*, the attic space was adjacent to, or arguably a part of, the area of consent. *See id.* at 1362. Second, the search of the box did not result in anything remotely similar to structural damage -- to either the truck, its trailer, or the boxes. As hordes of college students and others who seek out discarded boxes at grocery stores are well aware, cardboard boxes that were once taped, glued, or closed in some other manner are just as capable of performing their function on subsequent occasions with the help of a brand new piece of tape. In this respect, notwithstanding the first distinction, the search of the boxes is more similar to the search that we upheld in *United States v. Flores*, where troopers unscrewed two screws and removed two vent covers from the interior panels of a vehicle. 63 F.3d 1342, 1362 (5th Cir. 1995). In each case, with minimal effort, the structure of the vehicle, and the boxes opened by Agent Lopez, can be restored to their original condition.

The cardboard boxes in this case are not similar to locked briefcases. We therefore reject the appellant's argument that

the search of the box was *per se* unreasonable based upon the dicta of *Jimeno,* which addresses concerns that are inapplicable to facts at hand.[11]

### III.    Sentencing

Mendoza contends that his amended sentence, which, in addition to thirty months of jail time, calls for four years of supervised release, exceeds the statutory maximum of the drug crime for which he was convicted.  His argument is premised upon this court's evolving jurisprudence in the wake of the Supreme Court's decision in *Apprendi v. New Jersey*.  530 U.S. 466, 20 S. Ct. 2348, 147 L. Ed.2d 435 (2000).  There, the Court determined that "other than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt."[12] *Id.* at 490.

Mendoza was convicted of knowingly possessing marijuana, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1). The statute proscribes a minimum and maximum permissible sentence for a violation, based upon the amount and the type of drug.  § 841(b)(1)(D) mandates that prison time imposed for violations

---

[11]We base our decision on the specific facts found here, so we do not decide whether a package can ever be so well bound with tape that it is tantamount to a "locked" container for purposes of the Fourth Amendment.

[12]The Government, at oral argument, appeared to concede this argument. However, given the state of flux in this area of the law, and the time that has since passed, we feel obliged to apply the law as it stands on the day of this decision and determine the issue on the merits.

involving less than 50 kilograms of marijuana does not exceed five years.  As a Class D felony, such a violation is also subject to a maximum supervised release term of three years.  *See* 18 U.S.C. § 3583(b)(2); *United States v. Garcia*, 242 F.3d 593, 600 (5th Cir. 2001).  The district court originally sentenced Mendoza to 96 months in jail, followed by four years of supervised release, pursuant to the sentencing range prescribed in § 841(b)(1)(B) for violations involving over 100 kilograms of marijuana.   At the request of the Government, the district court subsequently amended the sentence to require 30 months of jail time, but did not adjust the four year period of supervised release.  Mendoza maintains that the four year period of supervised release violates *Apprendi.*

In *United States v. Doggett*, we held that *Apprendi* required that the quantity of drugs to be alleged in the indictment and proved to the jury beyond a reasonable doubt if, as here, the government seeks a sentence above the "core" five-year maximum in § 841(b)(1)(D).  230 F.3d 160, 163-65 (5th Cir. 2000).  The indictment against Mendoza charged him with possession of marijuana with intent to distribute under § 841(a)(1), but did not allege the quantity of marijuana involved.  Nor did the district court make a finding regarding drug quantity.

Mendoza argues, for the first time on appeal, that *Doggett* requires us to vacate and remand for resentencing his four-year term of supervised release.  230 F.3d 160.  In the time since the

-20-

parties submitted their briefs, both the Supreme Court and this court have handed down decisions that directly confront the question before us. *See United States v. Cotton,* — U.S. —, 122 S. Ct. 1781, 152 L. Ed.2d 860 (2002); *United States v. Longoria,* 298 F.3d 367 (5th Cir. 2002) (en banc), *cert. denied,* 123 S. Ct. 573 (2002); *United States v. Baptiste,* 309 F.3d 274 (5th Cir. 2002) (per curiam) (on petition for rehearing), *petition for cert. filed* (Dec. 13, 2002) (No. 02-8060), *and petition for cert. filed* (Dec. 20, 2002) (No. 02-8117).

In *Cotton*, the Supreme Court held that indictment omissions should be reviewed for plain error if the defendant failed to object to the enhanced sentence in the trial court. 122 S. Ct. at 1783. "Under that test, before an appellate court can correct an error not raised at trial, there must be (1) an 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *Id.* at 1785 (quoting *Johnson v. United States*, 520 U.S. 461, 466-467, 117 S. Ct. 1544, 137 L. Ed.2d 718 (1997). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The Government concedes that its failure to include drug quantity in the indictment, a fact that increased the statutory maximum sentence, was erroneous under the reasoning of *Apprendi.* At the time of sentencing, the decision in *Apprendi* had been on

-21-

the books for almost a year, and *Doggett* had been decided six months earlier. The error was therefore also plain. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (equating "plain" with "clear" or "obvious"). We decline to determine whether the error affected Mendoza's substantial rights, however, because we find that the error did not "seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cotton,* 122 S. Ct. at 1785.

In determining the impact of the error upon the judicial proceeding, *Cotton* requires us to consider the likelihood that the grand jury would have indicted the defendant of possessing with the intent to distribute that particular quantum of marijuana, had the Government requested, by assessing the available evidence relating to drug quantity. *See Cotton,* 122 S. Ct. at 1786; *Longoria,* 298 F.3d at 373-74; *Baptiste*, 2002 WL 31178217, *2. If the evidence supporting the drug quantity that the district court used as a basis for Mendoza's enhanced term of supervised release is "overwhelming" and "essentially uncontroverted," than the error cannot be said to have seriously affected the integrity of the proceedings. *Cotton*, 122 S. Ct. at 1786.

Mendoza never disputed at trial or at sentencing that his truck contained over 150 kilograms of marijuana when he came through the Sierra Blanca checkpoint. He admitted in a statement produced by his attorney on his behalf that he believed he was

-22-

transporting approximately 300 pounds (approximately 145 kilograms) of marijuana.  Additional statements throughout the record consistently note that over 150 kilograms of marijuana were ultimately discovered inside the truck.  Given these circumstances, and the precedent by which we are bound, we feel constrained to find that the failure to mention drug quantity in the indictment does not rise to the level of remediable plain error.

## IV.  Conclusion

For the foregoing reasons, we find that the search of the defendant's truck was consensual and conducted in a reasonable manner consistent with the requirements of the Fourth Amendment. The terms of the defendant's supervised release, while erroneous, do not rise to the level of remediable error.  The conviction and sentence are affirmed.

AFFIRMED.