**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**March 3, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 04-10368

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RICKY FIELDS,

Defendant-Appellee,

Appeal from the United States District Court
for the Northern District of Texas
(No. 4:03-CR-255-A)

Before WIENER and PRADO, Circuit Judges, and KINKEADE,[*] District
Judge.

PER CURIAM:[**]

Plaintiff-Appellant the United States of America
("government") appeals the suppression of evidence found by
officers during a warrantless search of Defendant-Appellee Ricky
Fields's apartment. The government argues that the officers were
legally in the home by consent. We find that the officers exceeded
the scope of consent given and therefore affirm.

## I. FACTS AND PROCEEDINGS

---

[*] District Judge for the Northern District of Texas, sitting
by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## A. Background Facts

On the night of June 9, 2000, three police officers, Officers Carlson, Tatsak and Powell, were dispatched to a domestic dispute call at an apartment in Everman, Texas. When the officers arrived, they were met by Maria/Marie[1] Price, who informed them that her boyfriend/husband, Fields, had locked her out and moved some of her belongings out of the apartment.[2] There was no evidence of any physical altercation and none is alleged by either Price or Fields. The officers used their batons to knock on the front and back doors of the apartment but received no response. Noticing that one of the apartment windows was broken, Officer Powell suggested to Price that an officer climb in through the broken window and unlock the entrance from the inside. Price consented to that recommendation, and Officer Powell, after removing shards of broken glass, climbed through the window, then unlocked and opened the front door. Officers Carlson and Tatsak, along with Price, entered the apartment, which appeared to be in disarray. The officers then searched the premises for Fields, eventually finding him asleep in the upstairs bedroom. Officer Tatsak awakened Fields and questioned him about his earlier dispute with Price. Officer Carlson, at the top of the staircase, spotted a gun barrel

---

[1] It is uncertain, looking at the record, as to which is her name.

[2] One testifying officer referred to Price as Field's girlfriend, and the other referred to her as his wife.

2

protruding from underneath a towel. He uncovered the gun, a revolver, picked it up, and disarmed it by removing the cartridges from the cylinder and the cylinder from the gun. Officer Carlson asked Fields to whom the gun belonged, and Fields responded he had received it as a gift.

At some point, Officer Carlson went downstairs with the gun, went outside to his patrol car, and called the dispatcher. Officer Carlson had the serial number run on the gun and was advised that the gun had been reported stolen. While that was transpiring, Officers Tatsak and Powell were attempting to mediate between Fields and Price who were angry and yelling at each other. Eventually, Price volunteered to leave the apartment and go elsewhere. The officers left but took the revolver with them. Later that night, the officers were informed that in fact the gun was not stolen. At some time following the incident, the authorities discovered that Fields was a convicted felon.

## B. PROCEEDINGS

Fields was charged with being a felon in possession of a firearm, a violation of 18 U.S.C. § 922(g)(1). He filed a motion to suppress the firearm seized from his home without a warrant. The district court held a suppression hearing and granted Fields's motion, holding that the government had failed to meet its burden of showing that the search of Fields's apartment was conducted within the scope of the consent given by Price, or that the seizure

3

of the firearm was otherwise lawful. The government then filed a notice of appeal of the court's decision to suppress the revolver.

## II.    ANALYSIS

### A.    STANDARD OF REVIEW

"The 'standard of review for a motion to suppress based on live testimony at a suppression hearing is to accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law.'"[3] Evidence is considered "in the light most favorable to the prevailing party," here the Defendant Fields.[4] The ultimate conclusion about the constitutionality of the law enforcement conduct is reviewed de novo.[5]

### B.    THE OFFICERS EXCEEDED THE SCOPE OF CONSENT

The district court concluded that the government failed to meet its burden of showing that the officers acted within the scope of consent given by Price. In determining the scope of a consent to search, a court does not consider the subjective intentions of the consenting party or subjective interpretations of the officers.[6] The standard for measuring the scope of consent "is

---

[3] United States v. Outlaw, 319 F.3d 701, 704 (5th Cir. 2003) (quoting United States v. Williams, 69 F.3d 27, 28 (5th Cir. 1995) and United States v. Alvarez, 6 F.3d 287, 289 (5th Cir. 1993)).

[4] United States v. Shelton, 337 F.3d 529, 532 (5th Cir. 2003).

[5] Id.

[6] 3 Wayne R. LaFave, Search and Seizure § 8.1 (3d ed. 1996).

4

that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange" between the officers and Price.[7] Objective reasonableness is a question of law that is reviewed de novo,[8] but the factual circumstances surrounding the consent "are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given."[9] "The trial court's factual findings must be accepted unless they are clearly erroneous or influenced by an incorrect view of the law."[10]

The district court, in its findings of fact, stated that (1) after Fields failed to answer the door, the officers suggested to Price that one officer could climb into the apartment through the broken window and unlock the exterior door, and (2) Price consented only to that act. The district court's finding is supported by testimony provided at the suppression hearing. In response to questioning from the court as to what Price actually consented to,

---

[7] Florida v. Jimeno, 500 U.S. 248, 251 (1991).

[8] See United States v. Ibarra, 965 F.2d 1354, 1357 (5th Cir. 1992) (en banc) (7-7 decision).

[9] United States v. Mendoza-Gonzalez, 318 F.3d 663, 667 (5th Cir. 2003). "When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent. It is thus important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity." 3 LaFave, supra note 6, § 8.1.

[10] United States v. Rich, 992 F.2d 502, 505 (5th Cir. 1993) (internal quotations omitted).

5

Officer Tatsak stated that: "I can't tell you exactly what her reasoning was. She just wanted us to get in the house and unlock the door."[11] Considering the evidence "in the light most favorable to the prevailing party," we conclude that the district court did not err in ruling that the officers acted outside the scope of consent given by Price when after entering the apartment and unlocking the front door, they proceeded on their own to search the entire premises.

The government contends on appeal that the officers were entitled to make a protective sweep of the entire apartment pursuant to our recent decision in United States v. Gould.[12] In Gould, officers went to a mobile home in response to information received that Gould, known to be a convicted felon with a reputation for violence, was planning to kill two local judges. The officers' trip to the mobile home was for the sole purpose of speaking with Gould. Another resident of the mobile home consented to the officers' entry to talk to Gould and indicated he was in his bedroom. When the officers looked through the open door to Gould's bedroom, they saw that he was not there and proceeded to conduct a protective sweep of the bedroom, during which they seized three rifles that were in plain view.

---

[11] Officer Carlson was unable to remember whether Price consented to anything. Officer Powell did not testify at the suppression hearing.

[12] 364 F.3d 578 (5th Cir.) (en banc), cert. denied, 125 S.Ct. 437 (2004).

Looking to the Supreme Court's decision in <u>Maryland v. Buie</u>,[13] we established a five-part test for analyzing the constitutionality of a protective sweep: (1) The police must not have entered or remained in the home illegally, and their presence within the home must have been for a legitimate law enforcement purpose; (2) the protective sweep must be supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the legitimate protective sweep may be no more than a cursory inspection of those spaces where a person might be found; (4) the sweep may last no longer than is necessary to dispel the reasonable suspicion of danger; (5) the sweep may last no longer than the police are justified in remaining on the premises.[14]

In the instant case, the officers only had consent to enter through the window and proceed directly to the entrance door to unlock and open it; the consent extended to no other areas of the apartment. Once the door-unlocking mission was accomplished, the consent to be in the apartment ended. There was neither need nor consent for the other two officers to enter the apartment once the door was opened, and there was no necessity for them to make a protective sweep of the entire apartment, including the upstairs, to secure the one officer's safe withdrawal after unlocking the

---

[13] 494 U.S. 325 (1990).

[14] <u>See</u> <u>Gould</u>, 364 F.3d at 587.

door.  The so-called protective sweep exceeded the scope of the consent to make the warrantless entry, both temporally and spatially, and there was no issue, even fleeting, of safety.  It follows that the unlawful search in the guise of a protective sweep could yield no evidence capable of surviving a motion to suppress. The district court's suppression of the firearm is AFFIRMED.[15]

---

[15] In the alternative, the government argues that the evidence should not be suppressed because the officers acted in the objectively reasonable belief that their conduct did not violate the Fourth Amendment.  Under the "good faith" exception to the exclusionary rule, "evidence is not to be suppressed . . . where it is discovered by officers in the course of actions that are taken in good faith and in the reasonable, though mistaken, belief that they are authorized."  United States v. De Leon-Reyna, 930 F.2d 396, 400 (5th Cir. 1991).  In light of the evidence at the suppression hearing, we decline to find that the officers were objectively reasonable in believing they were entitled to search the entire apartment.