# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

July 1, 2010

No. 09-20585

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

PERCY LAFAYETTE GREEN, also known as Character

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Texas
No.4:08-cr-00451-ALL

Before REAVLEY, WIENER, SOUTHWICK, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant Percy Lafayette Green entered a plea of guilty to being a felon in possession of a firearm in violation of 18 U.S.C. 922(g)(1). His plea was conditioned on the result of his appeal of the district court's denial of his motion to suppress. Green specifically challenges the district court's refusal to suppress (1) a statement that Green made to state law enforcement outside a motel, long after his traffic-stop, disclosing the existence and location of a loaded shotgun in his motel room, which statement he claims was uttered in

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-20585

violation of *Miranda v. Arizona*;[1] and (2) the shotgun itself, the seizure of which resulted from the ensuing warrantless search of his motel room, which Green claims was conducted in violation of the Fourth Amendment. We affirm.

## I.  Facts & Proceedings

### A.  Background

On April 16, 2008, two Houston police officers noticed Green driving away from the Advanced Motel, a location known for drug activity and prostitution. After observing him commit several traffic violations, the officers signaled Green to pull over, which he failed to do until a red traffic light at an intersection forced him to stop. As the officers approached Green's car on foot, one of them saw Green stuff a plastic bag of what appeared to be cocaine into the front waistband of his trousers. The officers instructed Green to get out of his car. After he complied, they conducted a pat-down and removed a bag from his waistband that proved to contain cocaine. The officers handcuffed Green and placed him in the back seat of their patrol car.

With Green secured in the patrol car, one of the policemen, Officer Turrentine, ran a check for outstanding warrants, but none was found. Meanwhile, the other policeman, Officer Duron, conducted an inventory of Green's car. An hour and a half elapsed between the time of Green's arrest and the arrival of a tow truck to remove Green's car from the side of the road. At no time was Green advised of his *Miranda* rights

At some point during Green's hour and a half sojourn in the patrol car, he revealed, unprompted, that the cocaine found on his person belonged to a woman, Amanda Perkins, who was asleep in his room at the Advanced Motel. Green told Officer Turrentine that Perkins had "a lot" of crack cocaine in the motel room, and that she would confirm that the cocaine found on Green

---

[1] 384 U.S. 436 (1966).

belonged to her.  Green "pleaded" — his own words — with the officers to take him back to the motel so that Ms. Perkins could verify his story, and the officers agreed to do so.

When the officers and Green arrived at the motel, Green volunteered to go up to his room to retrieve Ms. Perkins and the narcotics himself, but Officer Turrentine refused Green's offer. Officer Turrentine testified that "I advised [Green] that I would go up to the room and get Amanda, and he agreed." At that point, Green gave Officer Turrentine the key to Green's room, which the officer would need to gain entry.

Before proceeding to the motel room, Officer Turrentine asked Green if there was anyone in it other than Ms. Perkins and if there were any weapons in the room.  Green answered that Ms. Perkins was the only person there and that there was a loaded shotgun under the mattress, which he had borrowed from a friend of his son.  Green does not contend that the officer inquired about the gun's provenance or location; Green appears to have volunteered this information.  It is undisputed that at the time Green was asked about the presence of firearms in the motel room (1) the officers were unaware of Green's status as a convicted felon on parole and (2) the officers had never advised him of his Fifth Amendment rights under *Miranda*.

Officer Turrentine approached Green's motel room and opened the door without knocking.  Inside, he found Ms. Perkins asleep in the bed and saw some drug paraphernalia and several small rocks of crack cocaine on a bedside table. The officer woke Perkins and escorted her downstairs to the patrol car.  Officer Turrentine then returned to the motel room and recovered the crack cocaine from the bedside table and the shotgun from under the mattress.  When he returned to the patrol car, Officer Turrentine informed Green that he had not found the quantity of crack cocaine that he had expected from Green's description.  Green offered—again, unprompted—to show the officer where the

rest of the narcotics were located, so Officer Turrentine escorted Green up to the room where Green recovered two bags of crack cocaine that were hidden in two cereal boxes on the dresser.  It appears that Green asked whether, in exchange for his cooperation, the officers would be willing to make a deal with him, but Officer Turrentine refused and returned Green to the back seat of the patrol car.

After recovering the additional crack cocaine, the officers ran a search on the shotgun they had recovered to determine whether it had been stolen.  They also ran a search of Green's criminal history and discovered for the first time that he was a convicted felon on parole.  At that point, the officers transported both Green and Perkins to the Harris County jail.

In April 2008, the Houston Police Department referred Green's case to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") because Green was a convicted felon found in possession of a firearm.  Before meeting with Green,  ATF Agent Jacobs, who subsequently testified at the suppression hearing, reviewed Green's case file and noticed that it did not indicate that Green had been advised of his *Miranda* rights, but did reflect that he had admitted to the Houston police officers who had arrested him that there was a shotgun in his motel room.

When ATF Agent Jacobs interviewed Green for the first time at the Harris County Jail on June 18, 2008 — a month after his initial arrest — the first thing he did was to advise Green of his *Miranda* rights.  After Green executed a written waiver, he admitted to Agent Jacobs that he knew he was a convicted felon and should not have a firearm; that he knew the shotgun was under his mattress on the day of his arrest; and that the shotgun belonged to a friend of his son.

## B.    Proceedings

No. 09-20585

In July 2008, a grand jury indicted Green for unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1).[2]  In December 2008, Green filed a motion to suppress (1) the statements he had made regarding the presence of the firearm in the motel room and (2) the firearm itself. In his motion to suppress, Green contended that (1) his statements regarding the shotgun had been unconstitutionally obtained in violation of his Fifth Amendment rights safeguarded by *Miranda*; and (2) the search underneath the mattress, which had yielded the shotgun, violated the Fourth Amendment because it had been carried out without a warrant and exceeded his consent. Specifically, Green insisted that the officers' search of the bed exceeded the scope of the motel room search to which Green *did* consent.

In its opposition to Green's motion, the government asserted that the search of Green's entire motel room was consensual. The government also urged that Green's voluntary statements regarding the existence and location of the shotgun did not offend *Miranda* because they fell within the "public safety" exception as articulated in *New York v. Quarles*.[3]

After a suppression hearing in January 2009, at which Officer Turrentine and ATF Agent Jacobs testified, the district court denied Green's motion in a ruling from the bench.  In March 2009, Green entered a guilty plea on the condition that he be permitted to challenge the district court's ruling on his motion to suppress.  This timely appeal followed.

---

[2]  18 U.S.C. 922(g)(1) provides, in relevant part:
(g) It shall be unlawful for any person -
   (1) who has been convicted in any court of a crime
   punishable by imprisonment for a term exceeding one  year; . . . .
   to ship or transport in interstate or foreign commerce, or possess
   in or affecting commerce, any firearm or ammunition; or to
   receive any firearm or ammunition which has been shipped or
   transported in interstate or foreign commerce.

[3]  467 U.S. 649 (1984).

5

No. 09-20585

## II.  Analysis

### A.  The alleged Fifth Amendment violation

"We review a district court's factual findings surrounding a motion to suppress statements made in violation of *Miranda* under the clear error standard, and review conclusions of law *de novo*."[4]  We may affirm the district court's ruling on any grounds supported by the record.[5]

Green seeks to suppress the statements that he made regarding the presence and location of the shotgun in his motel room.  He reiterates the contention he advanced in the district court that the officers violated his Fifth Amendment rights when they asked him whether there were firearms in his motel room without first advising him of his *Miranda* rights.  Relying on *U.S. v. Braithwaite*,[6] Green argues that the public safety exception to *Miranda* cannot apply because no *imminent* threat to the public's safety existed at the time he was asked about the presence of firearms in his motel room.  In *Brathwaite*, we held that the police cannot rely on the public safety exception to giving a *Miranda* warning once the danger inherent in a confrontation has passed.[7]  In that case, we determined that the public safety exception did not apply when the police—who were in possession of a warrant, had already conducted two protective sweeps of the premises to be searched, and had then arrested and handcuffed the defendant—failed to *Mirandize* the defendant before asking him about the presence of firearms.[8]

---

[4] *United States v. Brathwaite*, 458 F.3d 376, 382 (5th Cir. 2006)(citations omitted).

[5] *United States v. McSween*, 53 F.3d 684, 687, n. 3 (5th Cir.1995).

[6] *Brathwaite*, 458 F.3d at 378.

[7] *Brathwaite*, 458 F.3d at 382, n. 8.

[8] *Id.* at 382, n. 8.

6

No. 09-20585

Green analogizes his case to *Brathwaite*, contending that because he had already been in custody for an hour and a half, and because the officers had had plenty of time to obtain a warrant to search the motel room or to advise him of his rights, the government's contention—that the officers were faced with an immediate and on-going threat to public safety, which trumped Green's *Miranda* rights—is specious.

The government counters that the public safety exception should apply because, unlike the situation in *Brathwaite*, the danger inherent in the instant situation had not yet passed: The officer asked about the presence of firearms *before* entering a motel room at the behest of an arrestee—a room that the arrestee had led the officer to believe would contain both a large quantity of crack cocaine and another drug user or dealer. In essence, the government contends that the fact that the police had sufficient time to advise Green of his *Miranda* rights or to seek a warrant, or *both,* is irrelevant to the applicability of the public safety exception.

The public safety exception archetypically applies in those situations in which law enforcement is confronted with an on-going conflict, arrest, or other volatile situation.[9] It does not apply, however, when law enforcement is simply aware of or believes that contraband may be located in a particular location to

---

[9] *United States v. Lee*, 188 Fed. App'x 326, 328 (5th Cir. 2006)(unpublished) (public safety exception applied when arrestee voluntarily disclosed that he possessed a weapon and therefore "concern about the safety of the officers at the scene and the numerous onlookers" excused officers' failure to give *Miranda* warnings before asking where the firearm was located); *U.S. v. Roberson,* 20 F.3d 1171 (5th Cir. 1994) (public safety exception applied when, after finding a knife in the course of a patdown of an arrestee, the officer asked the arrestee if he had any other weapons); *Fleming v. Collins*, 954 F.2d. 1109, 1109 (5th Cir. 1992) (*en banc*) (holding that public safety exception applied because concern for the officers' safety in the confusing aftermath of a botched bank robbery excused the officers' failure to read *Miranda* warnings when they came upon a man pointing a pistol at another man (who ultimately proved to the defendant) in an open field near the bank); *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) (public safety exception excused officer's failure to *Mirandize* the arrestee before asking whether he had any other objects on his person that might harm the officer after the officer found a syringe in the arrestee's pocket in the course of a patdown).

which the public does not have access, such as a vehicle or, arguably, a motel room.[10] The exception exists to permit law enforcement to neutralize any immediate or lingering danger to themselves or to the public, and to avoid forcing law enforcement officers to wrestle with the Hobson's choice "often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the Miranda warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings . . . but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them."[11] The Supreme Court has described the exception as "narrow," instructing that "in each case it will be circumscribed by the exigency which justifies it."[12]

As Green correctly notes, the facts of this case hardly suggest the conditions of exigency that justify the application of the exception.[13] The government does not explain — and the officers who testified at the suppression hearing were never asked — *why* they failed to *Mirandize* Green (which, unlike obtaining a warrant, would have taken but a few minutes) before they approached and entered the motel room. They obviously had ample time to do so without incurring any risk to themselves or to the public, and without jeopardizing their mission.

---

[10] *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989) (holding it "difficult . . . to find that the public-safety exception applies" when the police asked about the location of a weapon they already believed to be in the defendant's truck *after* the defendant was under arrest, the truck had been seized by the police, and the weapon therefore presented no danger to the public).

[11] *New York v. Quarles*, 467 U.S. 649, 658 (1984).

[12] *Id. Accord Fleming*, 954 F.3d at 1112 (holding that the public safety exception applies only to "certain narrow, exigent situations").

[13] *Fleming*, 954 F.2d at 1112 (noting that the policy rationale for the public safety exception is "analogous to the justification for the exigent circumstances exception to the Fourth Amendment warrant requirement.").

We need not address this issue, however, because Green's *ex post Mirandized* statement to the ATF agent, which was identical to his pre-seizure admission to the Houston police officers, is readily admissible. When juxtaposed, the Supreme Court's decisions in *Elstad*[14] and *Seibert*[15] provide the applicable analytic framework. In *Seibert,* the Supreme Court "refused to allow the post-warning confession where a 'two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.'"[16] The Court explained that "[t]he use of such a strategy involves an interrogator "rel[ying] on the defendant's prewarning statement to obtain the postwarning statement used against her at trial [,] ... [by] confront[ing] the defendant with her inadmissible prewarning statements and push[ing] her to acknowledge them."[17]

We have interpreted the resulting analytic framework for such "two-step" interrogations thus: "'*Seibert* requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, '[t]he admissibility of postwarning statements [ ] continue[s] to be governed by the principles of *Elstad*.'"[18] Green does not contend that a *deliberate,* two-step strategy was used, or that the ATF agent ever confronted him with his prior admission to the Houston Police. Thus, the principles of *Seibert* do not apply here; but, as shall be seen, those of *Elstad* do.

---

[14] *Oregon v. Elstad,* 470 U.S. 298 (1985).

[15] *Missouri v. Seibert*, 542 U.S. 600 (2004)(Kennedy, J., concurring in judgment).

[16] *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007) (quoting *Seibert,* 542 U.S. at 622).

[17] *Seibert*, 542 U.S. at 621.

[18] *Nunez-Sanchez*, 478 F.3d at 668 (quoting *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir.2006) (citing *Seibert*, 542 U.S. at 622) (modifications in original)).

In *Elstad*, the Supreme Court held that when a confession is obtained before the suspect has been *Mirandized*, "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was *voluntary*."[19]   Moreover, "a suspect who has responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his  rights and confessing after he has been given the requisite *Miranda* warnings."[20]   Under the principles of *Elstad*,"[t]he test for deciding if a statement is involuntary is if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are 'so offensive to a civilized system of justice that they must be condemned.'"[21] That is obviously not the case here.  Green was under arrest, and had been for some time, when he was asked about presence of firearms in his motel room.  This distinguishes his situation from defendants in similar cases in which unwarned statements were held to be voluntary.[22] The totality of the circumstances here, however, belies any suggestion that his response was coerced:  Green was asked a *single* question about the presence of firearms and other persons in the motel room before the police carried out a search of the room that Green himself had begged them to perform, and in which he sought to participate.[23]

---

[19] *Elstad*, 470 U.S. at 318 (emphasis added).

[20] *Id.* at 318.

[21]  *United States v. Hernandez*, 200 Fex. App'x 282, at *3 (5th Cir. 2006)(citing *United States v. Bengivenga,* 845 F.2d 593, 601 (5th Cir. 1988)).

[22]  *See, e.g., Elstad*, 470 U.S. at 316 (defendant had not been placed under formal arrest and was unaware that there existed a warrant for his arrest);  *Hernandez*, 200 Fex. App'x. at *3 (5th Cir. 2006) (defendant had been pulled out of TSA security screening line after setting off a metal detector but was not under arrest).

[23]  *Elstad*, 470 U.S. at 310 ("[i]t is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances  calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for

No. 09-20585

Moreover, even if Green's statement to the Houston police could conceivably be deemed "coerced," sufficient curative measures were taken: (1) His second interrogation was carried out by a different agent, whom he had never met and who was with a different law enforcement agency (the federal ATF); (2) more than a month elapsed between his initial statement to the Houston police officers and his interrogation by the ATF agent; and (3) there is no suggestion in the record that the ATF agent confronted him with his prior admission to the Houston police.[24]

For these reasons, the district court did not err when it refused to exclude, on Fifth Amendment grounds, Green's statement regarding the presence and location of the shotgun in his motel room.

## C.    The alleged Fourth Amendment violation

When a defendant challenges the constitutionality of a search and seizure under the Fourth Amendment, and the district court denies the motion to suppress based on live testimony at a suppression hearing, we accept the trial court's factual findings unless they are "'clearly erroneous or influenced by an incorrect view of the law,'" and we review the evidence in the light most favorable to the prevailing party.[25]   "The ultimate conclusion about the constitutionality of the law enforcement conduct is reviewed *de novo*."[26] We may

---

some indeterminate period.").

[24]  *Elstad*, 470 U.S. at 310 (holding that "[w]hen a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession.").

[25]  *United States v. Rodriguez*, 601 F.3d 402, 405 (5th Cir. 2010)(internal marks and citations omitted); *United States v. Hernandez*, 279 F.3d 302, 306 (5th Cir. 2002)(reviewing denial of motion to suppress in the light most favorable to the prevailing party).

[26]  *Id.* (citations omitted); *United States v. Moody*, 564 F.3d 754, 760 (5th Cir. 2009) (citations omitted).

affirm the district court's exclusionary ruling on any rationale supported by the record, although "where a police officer acts without a warrant, the government bears the burden of proving that the search was valid."[27]

Green claims that, when Officer Turrentine looked underneath the mattress and recovered the shotgun, he exceeded the scope of the consent that Green had given to search the motel room. Green seeks to suppress the shotgun as fruit of the poisonous tree.[28] He contends that the scope of his consent was encapsulated in his response to Officer Turrentine's declaration that he—and not Green—would go into the motel room and bring Ms. Perkins back to the patrol car, presumably so that Green could speak with her. Thus, Green insists that Officer Turrentine was not authorized to search under the mattress and seize the shotgun that was found there because doing so went beyond merely retrieving Ms. Perkins. The government responds that, by telling the officers not just about Ms. Perkins but also about the large quantity of narcotics in his room; by pleading with them to enter; by giving them the key; and by uttering no words of restriction or limitation whatsoever, Green effectively gave the officers his unconditional and unqualified consent to search every part of the room.

"A warrantless entry into and search of a dwelling is presumptively unreasonable without a warrant unless consent is given or probable cause and exigent circumstances justify the encroachment."[29] These Fourth Amendment protections extend to the rooms of guests in motels.[30] "[T]he standard for

---

[27] *Id.* (citations omitted).

[28] *Mapp v. Ohio*, 367 U.S. 643 (1961).

[29] *United States v. Santiago*, 410 F.3d 193, 198 (5th Cir. 2005). *Accord Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

[30] *United States v. Richard*, 994 F.2d 244, 247 (5th Cir. 1993).

measuring the scope of . . . consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?"[31]

> When the police are relying upon consent as the basis for their warrantless search, they have no more authority than they have apparently been given by the consent. It is thus important to take account of any express or implied limitations or qualifications attending that consent which establish the permissible scope of the search in terms of such matters as time, duration, area, or intensity.[32]

Although "[o]bjective reasonableness is a question of law that is reviewed *de novo* . . . the factual circumstances surrounding the consent 'are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given.'"[33]  The scope of consent may also be limited by "the stated object of the search."[34]  "Where the defendant has failed to limit the scope of the search, the question that remains in determining its validity is whether, under the totality of the circumstances, the search was reasonable."[35]

By insisting that we consider only his nonspecific acquiescence in Officer Turrentine's statement that he would enter the motel room and retrieve Ms.Perkins from it, Green essentially urges us to adopt an artificially surgical approach to delimiting the outer bounds of consent.  Such an approach cannot be squared with the reasonableness standard that our precedents have

---

[31]  *Florida v. Jimeno*, 500 U.S. 248, 251 (1991).

[32]  *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003).

[33]  *Mendoza-Gonzalez*, 318 F.3d at 667 (citations omitted).

[34]  *Mendoza-Gonzalez*, 318 F.3d at 668 (citing *Jimeno*, 500 U.S. at 251 (holding that "[t]he scope of a search is generally defined by its expressed object.").

[35]  *United States v. Mendez*, 431 F.3d 420, 427 (5th Cir. 2005).

established for analyzing the scope of consent, especially when, as here, Green's actions so belie his claims.[36] He told the officers that there were large quantities of narcotics inside his motel room and gave them the key to the room;[37] he neither spoke nor implied *any* limiting instructions as to the areas they could (or could not) search;[38] he never objected to either of Officer Turrentine's two return trips to the room.[39] In fact, Green even accompanied Officer Turrentine back up to the room to help the officer find the narcotics that he had failed to locate on previous trips; and Green volunteered—without being asked—the location and pedigree of the shotgun that was hidden under the mattress in his room. Obviously, this is not a situation in which the officer entered the premises with firm instructions—or even implications—from Green to proceed only from point a to point b, or to recover only a single item from a discrete location within the room.[40]  On the contrary, Green gave the officers broad consent to search the room and, without being asked, told them the specific location of the shotgun.

---

[36] *Mendez*, 431 F.3d at 427 (5th Cir. 2005) (holding that the scope of consent asserted before the court is "inconsistent with Mendez's actions during the search" and therefore unreasonable).

[37] *United States v. McSween*, 53 F.3d 684, 687 (5th Cir. 1995)(noting that defendant's behavior in helping officers access a portion of his vehicle indicated broad consent).

[38] *United States v. Stewart*, 93 F.3d 189, 192 (5th Cir. 1996) (holding that when defendant "knew . . . that [the officer] was looking for illegal drugs, it is objectively reasonable to expect [the officer] to look *in* the [pill] bottle after [having been] giv[en] permission to look *at* the bottle.").

[39] *Mendez*, 431 F.3d at 427; *Mendoza-Gonzalez*, 318 F.3d at 667 (holding that defendant's failure to object when the agent began opening a box suggested that the agent's actions were within scope of initial consent).

[40] *See United States v. Kinkeade*, 141 Fed. App'x 42 (5th Cir. 2005) (unpub'd) (holding that officers exceeded scope of consent to enter home in response to domestic disturbance call when woman locked out of her house "just wanted the officer to climb through a broken window and unlock the exterior door" and consented "only to that act" and not to the officers going upstairs, finding her husband, and questioning him about a firearm they had seen from the top of the stairs).

Neither did Green object when the officer, having taken custody of Ms. Perkins, returned to the room to seize the shotgun. Under the particular circumstances of this case—a defendant turned eager informant—any reasonable officer would have understood Green's words and actions to constitute his consent to search the entirety of the room for narcotics and the shotgun, and to seize both.[41]

As with Green's statement concerning the shotgun, we perceive no error in the district court's refusal to suppress the shotgun itself.

### III. Conclusion

For the foregoing reasons, we are satisfied that the district court's denial of Green's motion to suppress his statement regarding the existence of the shotgun as well as the shotgun was fully justified. His resulting conviction and sentence are, in all respects,

AFFIRMED.

---

[41] *United States v. Robinson*, 217 Fed. App'x 503 (6th Cir. 2007) (holding that "[i]f a person advises a police officer that there is a potentially dangerous person in her house, that the person is in possession of firearms and then consents to a search of her house, an objectively reasonable person would expect the officer to search for both the potentially dangerous person and the firearms.").