# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30469

United States Court of Appeals
Fifth Circuit

**FILED**
July 31, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

versus

CHHAY LIM,

Defendant–Appellant.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, WIENER, and WILLETT, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Chhay Lim conditionally pleaded guilty of possession of a firearm by an illegal alien. He appeals pre-plea rulings denying his motions to dismiss the indictment, to admit evidence relevant to his immigration status, and to suppress evidence. We affirm the refusal to dismiss the indictment and admit the evidence. We affirm in part and reverse in part the denial of the motion to suppress. The judgment of conviction is vacated and remanded.

No. 17-30469

I.

In 1997, Lim, while a lawful permanent resident ("LPR"), was ordered removed from the United States after serving three years in prison for rape. The removal order became final in December 1998, when the Board of Immigration Appeals ("BIA") dismissed Lim's appeal. A warrant of removal was issued in February 1999, and Lim's immigration bond was formally deemed breached in June 1999.

On March 2, 2015, Immigration and Customs Enforcement ("ICE") officers executed the removal warrant and seized two firearms from Lim's house.[1] Lim had acquired the firearms after his removal order had become final. On March 27, 2015, Lim was indicted on two counts of possession of a firearm by an illegal alien under 18 U.S.C. § 922(g)(5).

In April 2015, Lim moved to reopen his removal proceedings to allow him to seek relief from removal under former section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c). The BIA granted the motion in May 2015. Those proceedings remain pending.

In his section 922 criminal proceedings, Lim moved to suppress the statements and evidence seized from his house. After a hearing, the district court denied the motion. Lim also moved to dismiss the indictment, asserting that, in light of the reopening of his removal proceedings, he was not an illegal alien at the time of the offense or indictment. The government opposed the motion, responding that on the date Lim possessed the firearms, he was an illegal alien subject to a final order of removal, and the reopening of the immigration proceedings did not retroactively restore him to LPR status for purposes

---

[1] The events resulting in discovery of the firearms are set forth in a later section.

of section 922. The district court denied the motion to dismiss.

Before trial, the parties filed several motions addressing the admissibility of evidence regarding Lim's immigration status. Because the district court was not convinced that the BIA's reopening of Lim's immigration proceedings had retroactive effect, it determined that "any evidence of curative efforts made by [Lim], subsequent to his March 2, 2015 arrest, relative to the legality of his alien status, lack[ed] relevance and . . . [was] inadmissible." Specifically, Lim would not be allowed to "'elicit factual testimony from his immigration attorney regarding the motion[s] that the attorney previously filed on [his] behalf . . . , the procedure involved, and the result achieved.'" Thus, the court also sustained the government's relevance objections as to Lim's boat registrations and commercial fishing licenses, though the relevance objections as to Lim's government-issued identification cards and tax returns were referred to trial "for reconsideration in the event that [he chose] to testify."

In light of the legal and evidentiary rulings, Lim executed a written plea agreement and pleaded guilty to the two-count indictment. The district court sentenced him, within the advisory guidelines range, to concurrent terms of ten months of imprisonment and one year of supervised release. Lim remains on bond pending appeal.

II.

The government contends that Lim possibly did not preserve his right to appeal *all* pretrial decisions. A guilty plea generally "waives [the] right to challenge any nonjurisdictional defects in the criminal proceedings that occurred

before the plea."[2]  A defendant can, however, "enter into a conditional guilty plea preserving the right to appeal pretrial rulings."[3]  Because "[a] conditional guilty plea may not be implied," it must usually "be in writing and designate the particular issues that are preserved for appeal; the government must consent to it; and the district court must approve it."[4]  We can "excuse[] variances from these technical requirements where 'the record clearly indicates that the defendant intended to enter a conditional guilty plea, that the defendant expressed the intention to appeal a particular pretrial ruling, and that neither the government nor the district court opposed such a plea.'"[5]

The written plea agreement does not indicate that the plea was conditional.  It also does not mention waiver of appellate rights.  The record at rearraignment, however, plainly indicates that Lim's plea was in fact conditional.  First, the court summarized the rights Lim waived by pleading guilty—the rights to a speedy and public trial by twelve jurors, to be presumed innocent until proven guilty beyond a reasonable doubt, to confront witnesses, to call witnesses, to testify, and to present evidence.

Then, on confirming that Lim understood the rights he would be waiving, the court switched to discussing the rights he would be preserving:

> THE COURT:  Now, Mr. Lim, typically upon entering a guilty plea, a defendant waives the rights that he otherwise would have to appeal his conviction.  In this instance, however, it is my

---

[2] *United States v. Olson*, 849 F.3d 230, 231 (5th Cir. 2017) (per curiam).  *See also* FED. R. CRIM. P. 11(a)(2) ("With the consent of the court and the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right to have an appellate court review an adverse determination of a specified pretrial motion.  A defendant who prevails on appeal may then withdraw the plea.").

[3] *Olson*, 849 F.3d at 231.

[4] *Id.*

[5] *Id.* (quoting *United States v. Stevens*, 487 F.3d 232, 238 (5th Cir. 2007)).

understanding that you and the government have agreed that you will not waive any right to appeal your conviction or your sentence, and that you will also not waive any other post-conviction remedies that may be available to you.

THE DEFENDANT:  Yes.

THE COURT:  Mr. Lim, is that a correct understanding?  Is that your understanding as well?

THE DEFENDANT:  Yes.

THE COURT:  All right.  And [AUSA] Latsis, is that a correct statement?

[AUSA] LATSIS:  Yes, Your Honor, that is correct.  We have stripped out all of the appeal waiver language so he is reserving all of his appellate rights.

THE COURT:   Okay. [Defense counsel] Meche, that an accurate statement?

[DEFENSE COUNSEL] MECHE:  Yes.

After finishing the discussion of appellate rights, the court defined, for Lim, each element of the offense.  During the explanation, Lim's attorney began to interrupt, and the court immediately responded, "Mr. Meche, this is the part, I believe, that creates the issue you would like to have reviewed by the circuit; is that correct?"  Meche responded, "That's correct."  After extended discussion, the court reemphasized that Lim "reserv[ed his] right to argue an appeal arising out of [the] statement" that "relates to a defendant who knows that he is an alien and that an immigration judge previously ordered him deported."

Later, the court attempted to summarize the factual issues.  It explained that its "understanding, based on all the motion practice and what we have covered today, is that . . . [t]he second fact [concerning Lim's knowledge of his illegal status] is contested . . . and [t]hat is the issue that [he] understand[s] [Lim] would like to have reviewed on appeal."  Lim's attorney agreed with that

No. 17-30469

summary.

The government then summarized the terms of the plea agreement and again noted that the parties had "stripped out the appellate waiver so Mr. Lim [was] preserving all of his appellate rights." Finally, after accepting Lim's plea, the court allowed Lim's counsel to proffer his objections to the draft jury instructions on the immigration-status issues.

The government correctly concedes that Lim preserved his right to appeal the denial of his motions to dismiss the indictment and present evidence concerning his immigration status.[6] The government weakly contends, however, that Lim did not do enough to preserve his right to appeal the denial of his motion to suppress. Though the government acknowledges that it stated on the record that it "stripped out all of the appeal waiver language so [Lim] is reserving *all* of his appellate rights," it claims that such a statement does not meet the particularity requirement.[7]

Lim properly preserved his right to appeal the denial of his motion to

---

[6] *See United States v. Fernandez*, 887 F.2d 564, 566 n.1 (5th Cir. 1989) (finding a conditional plea where the government conceded on appeal that the defendant had reserved her right to appeal the suppression issue).

[7] *Compare United States v. Minjarez*, 667 F. App'x 144, 145 (5th Cir.) (per curiam), *cert. denied*, 137 S. Ct. 406 (2016) (refusing to credit similar language as satisfying the spirit of Rule 11(a)(2) because "[t]he discussion recognizing that Minjarez retained the right to appeal does not show that he retained appellate rights beyond those ordinarily afforded to any defendant who pleads guilty unconditionally without a plea agreement"); *United States v. Olivas-Hinojos*, 637 F. App'x 140, 140 (5th Cir. 2016) (per curiam) ("Given that Olivas–Hinojos reserved the right to appeal only 'the issue of the validity of the search warrant,' not the denial of his suppression motion in general, the consent and probable cause issues are outside of the scope of the appeal reservation."), *with United States v. Santiago*, 410 F.3d 193, 197–98 (5th Cir. 2005) (determining that the defendant retained right to appeal an adverse suppression motion where the rearraignment transcript showed that the district court acknowldged the defendant's reservation of rights, the government withdrew its initial objections to the defendant's reservation, and the government submitted a factual basis with revisions stating that the defendant preserved his right to appeal the factual findings).

suppress. The discussion at the beginning of the rearraignment listed the rights that Lim agreed to waive, none of which included appellate rights. The court then moved on to determining whether everyone agreed that Lim was entering a conditional plea to preserve all appellate rights. During that discussion, everyone—Lim, his attorney, the AUSA, and the district court—agreed that he had preserved *all* appellate rights.

## III.

Lim claims the indictment must be dismissed because the BIA's order reopening his immigration proceedings returned him to LPR status and was retroactive, such that he was not an illegal alien at the time of the alleged offense. A denial of a motion to dismiss an indictment and issues of statutory interpretation are reviewed *de novo*. *United States v. Arrieta*, 862 F.3d 512, 514 (5th Cir. 2017).

Lim's claim rests on *Bonilla v. Lynch*, 840 F.3d 575 (9th Cir. 2016). There the defendant illegally reentered the United States after deportation. The BIA denied his motion to reopen because he "had lost his [LPR] status when he was deported and, even if reopening were granted, would not thereby regain it pending a new removal determination." *Id.* at 589. The BIA thus "believed he could never have sufficient lawful presence to become eligible for § 212(c) relief." *Id.* The Ninth Circuit reversed, explaining that "if the BIA grants a motion to reopen . . . the final deportation order is vacated—that is, it is as if it never occurred." *Id.* "[L]awful permanent resident status would be restored as if it had never lapsed." *Id.* at 592.[8]

---

[8] *See also Contreras-Bocanegra v. Holder*, 678 F.3d 811, 818–19 (10th Cir. 2012) ("When the Board grants a motion to reopen, this action vacates the underlying removal order and restores the noncitizen to her prior status."); *Plasencia–Ayala v. Mukasey*, 516 F.3d 738,

No. 17-30469

Under Lim's understanding of *Bonilla*, the reopening "restored [his LPR status] as if it had never lapsed, and as a result, Lim was permitted to possess firearms at all pertinent times." He believes that it would be inconsistent for "the BIA's order [to] be retroactive in some instances—such as immigration proceedings, and not retroactive in others—such as criminal prosecutions."

Section 922(g)(5) makes it unlawful for "any person . . . who being an alien . . . (A) is illegally or unlawfully in the United States" to "possess in or affecting commerce, any firearm or ammunition." We have defined "illegally or unlawfully" as "an alien whose presence within the United States is forbidden or not authorized by law."[9] And, we have interpreted "the structure and purpose of" section 922(g) as "support[ing] the view that Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat

---

745–46 (9th Cir. 2008) ("Several courts of appeals, including ours, have held that a grant of a motion to reopen vacates the final order of deportation. . . . Therefore, the grant of a motion to reopen automatically vacates the initial deportation order because it is based on a record that the BIA has deemed incomplete."), *overruled on other grounds by Marmolejo–Campos v. Holder*, 558 F.3d 903 (9th Cir. 2009) (en banc); *Bronisz v. Ashcroft*, 378 F.3d 632, 637 (7th Cir. 2004) ("[T]he grant of a motion to reopen vacates the previous order of deportation or removal and reinstates the previously terminated immigration proceedings.").

*But see United States v. Bravo-Muzquiz*, 412 F.3d 1052, 1057 (9th Cir. 2005) ("[A]n alien who had not been legally admitted to enter the United States and who had not applied for legal status at the time he possessed a firearm was 'illegally or unlawfully in the United States' for purposes of section 922(g)(5). Implicitly this recognizes that had Garcia applied for legal status prior to his possession of the firearm he would not have been at that time an alien illegally or unlawfully in the United States." (citations omitted)); *United States v. Hernandez*, 913 F.2d 1506, 1513–14 (10th Cir. 1990) ("Consequently, to be prosecuted under § 922(g)(5), an alien seeking amnesty under 8 U.S.C. § 1160 or § 1255 must either receive a firearm before filing an amnesty application or after such application is denied.").

[9] *United States v. Elrawy*, 448 F.3d 309, 312–13 (5th Cir. 2006) (quotation marks omitted) (explaining that "this definition is consistent with our description of an illegal alien as one who is in the United States without authorization" and is consistent with "the term 'unlawful presence,'" which we define "as presence in the United States after expiration of the period of [authorized] stay" (quotation marks omitted)).

to society.'"[10] "Illegal aliens are likely to be in that category because they are likely to maintain no permanent address in this country, elude detection through an assumed identity, and—already living outside the law—resort to illegal activities to maintain a livelihood."[11]

We must "give[] primacy to the applicant's legal status *before* he files an application for adjustment of status, as opposed to his *current* status (permitted to stay in the United States during the pendency of such application)." *Elrawy*, 448 F.3d at 314. "[U]nlawful status [does] not change merely by [the] filing [of an] application for adjustment of status." *Id.* Lim attempts to distinguish his case because his status *actually changed* to LPR. But, "an alien who has acquired unlawful or illegal status . . . cannot relinquish that illegal status until his application for adjustment of status is approved." *Id.* Lim did not "relinquish [his] illegal status until his" motion to reopen was granted— and that occurred *after* his arrest. His status at arrest was that of a deportable alien, so he was in the United States without authorization.[12]

---

[10] *Id.* at 313 (quoting *United States v. Orellana*, 405 F.3d 360, 366 n.36 (5th Cir. 2005)).

[11] *Id.* (quotation marks omitted). In *Orellana*, we determined that an illegal alien who had obtained Temporary Protected Status ("TPS") *before* being charged under Section 922(g) was not "unlawfully present" at the time of his arrest. *Id.* at 366. TPS meant that he did not "attempt to avoid detection," "revealed [his] whereabouts to the government," and was "authoriz[ed] to seek employment" such that he was "not part of an underground population of persons, who unable to secure lawful employment, have a greater likelihood to engage in criminal conduct." *Id.* at 368.

Lim claims he is analogous to Orellana because he too did not attempt to avoid detection, and he revealed his whereabouts to the authorities. Even accepting that as true, in *Orellana* we did not base our determination on the fact that Orellana lived his life openly. Instead, we explained that TPS aliens as a whole are lawfully present such that they can live openly. Here, Lim lived openly because he allegedly believed he had lawful status. His actual status, however, was that of an illegal alien, and that status falls squarely within the plain text of the statute and the type of category from whom Congress sought to prevent the acquisition of firearms.

[12] *See also United States v. Garcia*, 707 F. App'x 231, 234 (5th Cir. 2017) (per curiam)

No. 17-30469

In rejecting Lim's theory, we also look to the felon-in-possession context. In that context, the Supreme Court examined 18 U.S.C. § 1202(a)(1), which prohibited possession of a firearm by a person "convicted by a court of the United States or of a State . . . of a felony."[13]  Looking to the plain language, the Court determined, "Nothing on the face of the statute suggests a congressional intent to limit its coverage to persons whose convictions are not subject to collateral attack."[14]  "[I]ts plain meaning is that the fact of a felony conviction imposes a firearm disability until the conviction is vacated or the felon is relieved of his disability by some affirmative action."[15]  "Congress clearly intended that the defendant clear his status *before* obtaining a firearm,"[16] and that is "consistent with the common-sense notion that a disability based upon one's status as a convicted felon should cease only when the conviction upon which that status depends has been *vacated*."[17]

---

("The only dispute over the statute's application to Garcia is whether Garcia was illegally or unlawfully in the United States at the time of his arrest."); *United States v. Lucio*, 428 F.3d 519, 525 (5th Cir. 2005) (finding that on date of indictment, "the lawfulness (or rather, unlawfulness) of his immigration status [had not been] transformed because he had been accorded employment authorization and deportation proceedings were stayed").

[13] *Lewis v. United States*, 445 U.S. 55, 60 (1980).

[14] *Id.* (cleaned up).

[15] *Id.* at 60–61 ("The obvious breadth of the language may well reflect the expansive legislative approach . . . concerning the problem of firearm abuse by felons and certain specifically described persons.").

[16] *Id.* at 64.

[17] *Id.* at 61 & n.5 (emphasis added). *See also United States v. Hicks*, 389 F.3d 514, 536 (5th Cir. 2004) ("Like the provisions at issue in *Lewis* and *Chambers*, nothing in the language of 18 U.S.C. § 922(g)(8) indicates that it applies only to persons subject to a *valid*, as opposed to an *invalid*, protective order. . . . [Thus, it] violate[s] the plain meaning of 18 U.S.C. § 922(g)(8) [to] possess[] firearms and ammunition while . . . subject to a protective order."); *United States v. Chambers*, 922 F.2d 228, 233–34 (5th Cir. 1991) (holding in the context of § 922(n) that "the conviction, no matter how invalid, must be in some manner set aside *before* the party convicted may lawfully receive a firearm" (citing *Lewis*, 445 U.S. at 60–65)).

Lim attempts to distinguish *Chambers* because there the court reviewed whether "a

10

No. 17-30469

The plain text of Section 922(g)(5) similarly does not suggest that it covers only aliens who are not later found to be legally present. Instead, the use of the present tense—"is illegally or unlawfully in the United States"—indicates a concern with the status of the alien at time of arrest. And the legislative purpose of the statute reflects "that Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that they *may* not be trusted to possess a firearm without becoming a threat to society." *Elrawy*, 448 F.3d at 313 (quotation marks omitted) (emphasis added).

Someone ordered deported is here unlawfully. Though that decision may be vacated or reversed, once an alien is deemed deportable, he falls precisely into a category of persons Congress believes "may not be trusted." Thus, an illegal alien must first refute that status *before* obtaining a firearm, and the district court did not err in refusing to dismiss the indictment.

## IV.

Lim maintains that the district court erred by refusing to allow him to present evidence of the current state of his immigration proceedings. "The right to present a complete defense under the Sixth Amendment is an essential attribute of the adversary system." *United States v. Ramos*, 537 F.3d 439, 448 (5th Cir. 2008) (quotation marks omitted). We review alleged violations of that right *de novo*, subject to review for harmless error. *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008). Rulings on the admissibility of evidence,

state pardon or civil rights restoration respecting a state felony conviction is to be given fully retroactive effect." *Chambers*, 922 F.2d at 233. We refused to find that either would be retroactive because it was "highly dubious" that "Congress intended to give state officials the power to pardon for [an] already committed federal offense[]"—the offense of violating section 922(g) by possessing a firearm after a state felony conviction. *Id.* Here, it would also be "highly dubious" to assume that Congress "intended to give [the BIA] the power to pardon for [an] already committed federal offense[]." *Id.*

No. 17-30469

however, are reviewed for abuse of discretion. *United States v. DeLeon*, 170 F.3d 494, 497 (5th Cir. 1999).

Lim asserts that his immigration status is an element of the offense and that the ruling violated his Sixth Amendment right to a jury determination on every element of the crime. The government responds that the proposed evidence was irrelevant because whether Lim was "illegally or unlawfully in the United States" at the time of the offense is a question of law. According to the government, the proposed evidence would have created a substantial risk of unfair prejudice and jury nullification.

To establish a violation of § 922(g)(5), the government must prove "that (1) the defendant knowingly possessed a firearm that had been shipped or transported in interstate commerce; and (2) at the time of possession, the defendant was residing in the United States illegally."[18] Whether Lim was "illegally or unlawfully in the United States" at the time of the offense depends on the legal issue raised in his motion to dismiss the indictment. Whether the motion to reopen operates retroactively is obviously a question of law.[19] Because the BIA's grant of Lim's motion to reopen had no legal effect on his immigration status on the date of the offense, the evidence he sought to introduce was irrelevant and potentially confusing to a jury. *See* FED. R. EVID. 402, 403. The district court thus did not err in refusing to allow such evidence.

---

[18] *United States v. Lopez*, No. 92-2096, 1993 WL 152113, \*2 (5th Cir. Apr. 29, 1993); *see* 5TH CIR. R. 47.5.3 (noting that unpublished opinions issued before January 1, 1996, are precedent).

[19] *See United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) ("The sole question in this case, therefore, is a *question of law*: whether Flores's application for TPS and subsequent receipt of temporary treatment benefits cured his illegal entry into the United States for the purposes of § 922(g)(5)(A)." (emphasis added)).

No. 17-30469

V.

Invoking both the Fourth and Fifth Amendments, Lim appeals the denial of his motion to suppress both the statements he made about the presence of firearms and the firearms themselves.  Lim contends that "there was not probable cause to search [his] home, he did not consent to the search and the guns and statements were obtained before the agents advised him of his *Miranda* rights."

"Where a district court has denied a motion to suppress evidence, we review its factual findings for clear error and its conclusions of law *de novo.*" *United States v. Ortiz,* 781 F.3d 221, 226 (5th Cir. 2015).  Our review is "particularly deferential where denial of the suppression motion is based on live oral testimony because the judge had the opportunity to observe the demeanor of the witnesses."  *Id.* (cleaned up).  We "view the evidence most favorably to the party prevailing below, except where such a view is inconsistent with the trial court's findings or is clearly erroneous considering the evidence as a whole."  *Id.* (quotation marks omitted).  We review *de novo* whether a defendant waived his *Miranda* rights.[20]

A.

Now we recount the events leading to the confiscation of the firearms.  Though the timeline is murky and the parties sometimes disagree, all concur in the following:  Six ICE officers knocked on Lim's door at 6 a.m., and Lim answered the door dressed only in his underwear.  After the officers and Lim identified themselves, Lim complied with a request to step outside and was placed under arrest and handcuffed with his hands behind him.  But no

---

[20] *United States v. Hernandez,* 200 F. App'x 283, 286 (5th Cir. 2006) (per curiam) (citing *United States v. Cardenas,* 410 F.3d 287, 292 (2005)).

*Miranda* warning was administered at that time.  The officers offered to allow Lim to return inside to dress, but explained that they would have to accompany him inside if he did so.  Lim assented.  At this point, the parties offer slightly different accounts of what occurred inside the house.

According to Lim, once inside, he was immediately asked whether there were any weapons in the house, and he answered that there were two guns, one in the bedroom and one in the laundry room.  He was then escorted into his bedroom (still handcuffed) and asked where the gun was located, and he indicated a pile of clothes on a shelf.  As that occurred, another officer was performing a security sweep of the house, and Lim's wife and teenage children were sequestered in the living room.[21]  After the officers secured the gun in the bedroom,[22] Lim was read his *Miranda* rights.  Lim was then asked where he had obtained the gun, and he replied that he got it from a friend.  Lim then refused to talk anymore.  He dressed (he was uncuffed in order to dress and then recuffed) and was escorted outside.

Lim's sixteen-year-old son and fourteen-year-old daughter testified that the officers first asked their mom if there were weapons in the house, and she said, "I don't know."  Then the officers asked Lim, and Lim said yes, one in the bedroom and one in the laundry room.  The officers looked in the bedroom and laundry room but could not find the guns.  Neither child remembers telling an officer where the gun in the laundry room was located.  The daughter does not even remember ever seeing either gun before.

According to the government, on entering the house, Lim's wife was

---

[21] For reference, the house is a mobile home.

[22] A TriStar NCK-MO Model T-120 9mm semi-automatic pistol.

spotted. With his wife present, an officer then asked Lim whether there were any weapons in the house.[23] The officer saw Mrs. Lim's expression change, and Mr. Lim "advised hesitantly, yes there's a gun in the bedroom and he pointed there's a gun over there . . . [in] the laundry room." Another officer then asked to "secure the house" as Lim's children began to exit their rooms, and the officer "wanted to make sure that there were no additional people coming out of rooms to surprise us." The officers were unsure whether the security sweep had been concluded in the rest of the house before they entered the bedroom, but they knew a sweep had not yet been conducted of the bedroom.

Four officers accompanied Lim to the bedroom and asked for the location of the gun, and Lim replied that it was "[o]n the shelf with the clothes." An officer read Lim his *Miranda* rights,[24] then "asked [Lim] where he got the gun, and he indicated he got it from a friend. And he didn't want to go any further than that." An officer also testified that, because they planned to uncuff Lim, they would have searched any place "reasonably within grasping or lunging distance."[25] Lim was then uncuffed, allowed to dress, recuffed, and escorted out of the house.

---

[23] That officer testified that he "would always ask that question if we're going into a house because [he] need[s] to determine if there are any threats that could be posed" and because "Mr. Lim [would] eventually be unhandcuffed to put his clothes on."

[24] The officer explained that he typically does not "care about a *Miranda*" in immigration administrative arrests, because "his case is over and done with on the immigration side. Nothing he's going to say either way is going to affect anything that I'm going to do." Lim "was read *Miranda* once [the officer] identified that this case was transitioning from administrative immigration arrest to a potential gun case." The officer also said he "would ask [whether there were guns in the house] of anybody *before* reading them their *Miranda* rights, because [he] want[s] to know . . . for [his] personal safety."

[25] An officer testified that the shelf was "conceivably within lunging distance if [Lim] were not secured."

No. 17-30469

At some point, another officer, who overheard vaguely the discussion with Lim about weapons, began to make small talk with Lim's kids.[26]  The officer is unsure "if the question may have been asked if there were any other weapons that we need to know about, and collectively it seemed like it was common knowledge in the house with the kids . . . the kids definitely . . . sa[id] there was one in the washroom."  The officer looked in the washroom but "it wasn't obvious right off the get-go . . . So [he] asked [the kids] where is it exactly, and [they] said it was on the side of the dryer or washer."  The officer explained that he located the gun[27] in a place he "didn't look initially because it wasn't a space big enough for a person to fit in [his] opinion so there was no reason for [him] to look."

## B.

Lim seeks to suppress the guns, claiming the officers violated his Fourth Amendment rights by conducting a search without a warrant.  He insists that no consent, probable cause, or exigent circumstances existed to justify the search.  The government proffers several theories to support the validity of the search, including that (1) Lim gave consent when he agreed to allow the officers to enter his home; (2) the search was justified under the protective sweep doctrine; and, (3) Lim consented to the search when he voluntarily responded to the officer's questions about whether there were weapons and the location of the weapon.

---

[26] "OFFICER BONNET: "I'm not sure if that question was asked when I was doing the sweep or if it was before.  I'm not sure.  I just know at some point I did hear a conversation about weapons.  And then at some point I was being—you know, there was dialect [sic] about there being another weapon in the area where I was standing, and the kids was basically pointing to me, telling me it's over there near my area."

[27] A Marlin Model 6082 22-caliber rifle.

No. 17-30469

A "search of a dwelling is presumptively unreasonable unless consent is given or probable cause *and* exigent circumstances justify the encroachment." *United States v. Santiago*, 410 F.3d 193, 198 (5th Cir. 2005) (emphasis added). The parties dispute whether the district court denied the motion based on a protective sweep or voluntary consent theory. We can affirm, however, for any reason supported by the record. *Portillo v. Cunningham*, 872 F.3d 728, 734 (5th Cir. 2017).

The officers knew that Lim was an illegal alien and could not lawfully possess a firearm. Lim's response indicating he possessed firearms that were located in the house easily provided probable cause to believe that contraband was present.[28] Thus, we must review whether there were exigent circumstances to justify the search.

Viewing the evidence in the light most favorable to the government as

---

[28] Some other circuits allow the use of an un-*Mirandized* statement to establish probable cause for a search or seizure under the Fourth Amendment. *See United States v. Guillen*, 657 F. App'x 690, 692 (9th Cir. 2016) (mem.) ("[S]tatements may be used to determine whether probable cause existed even if [the defendant] should first have been administered *Miranda* warnings."); *United States v. Brinton*, 985 F.2d 575 (9th Cir. 1993) (mem.); *United States v. Buhrmaster*, 956 F.2d 1168 (9th Cir. 1992) (mem.); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1518 n.10 (6th Cir. 1988); *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987); *United States v. Morales*, 788 F.2d 883, 886 (2d Cir. 1986). *See also United States v. Medina*, 887 F.2d 528, 532–33 (5th Cir. 1989) (declining "to address the issue whether information obtained prior to a *Miranda* warning may be considered in determining probable cause"). Those circuits reason that the goals of the Fifth and Fourth Amendments are distinct, that a "*Miranda* violation is not in and of itself a violation of the Fifth Amendment," *Morales*, 788 F.2d at 886, that, absent coercion, "no 'valid and useful purpose'" supports "disregarding [a] pre-warned statement" and requiring an "officer to ignore incriminating admissions in arriving at a conclusion that there is probable cause," *id.*, and that the Supreme Court has explained "the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require . . . their fruits be discarded as inherently tainted." *See Patterson*, 812 F.2d at 1193 (quoting *Oregon v. Elstad*, 470 U.S. 296, 307 (1985)). *See also United States v. Brathwaite*, 458 F.3d 376, 382 n.7 (5th Cir. 2006) ("Introduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self–Incrimination Clause.").

No. 17-30469

the prevailing party, we find that an exigency existed only as to the pistol discovered in the bedroom. Lim was allowed to return into the house for the purpose of getting dressed. His clothes were in the bedroom, and he would be and was eventually uncuffed to facilitate that purpose. Thus, because the officers were told that a weapon was located in the very room where the arrestee would be uncuffed, their safety was potentially at risk.[29]  Because the search of the bedroom was justified by probable cause and exigent circumstances, that search did not violate Lim's Fourth Amendment rights. The district court did not err in refusing to suppress the pistol.

The second weapon, however, was located in an area of the house where Lim was never present during this sequence of events. Though a gun is easily removable and disposable, we have "consistently held that the presence of a firearm alone does not create an exigency."[30]  Thus, that theory cannot support the admission of the rifle discovered in the laundry room.

We therefore review whether a protective sweep supports admission of the rifle. "The protective sweep doctrine allows government agents, without a warrant, to conduct a quick and limited search of premises for the safety of the agents and others present at the scene." *United States v. Mendez*, 431 F.3d 420, 428 (5th Cir. 2005). "A protective sweep may even occur after the suspect is arrested." *United States v. Blevins*, 755 F.3d 312, 325 (5th Cir. 2014) (cleaned up). We determine the validity of a protective sweep by reviewing whether

---

[29] *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("The possibility that evidence will be removed or destroyed, the pursuit of a suspect, and *immediate safety risks to officers* and others are exigent circumstances that may excuse an otherwise unconstitutional intrusion into a residence." (emphasis added)).

[30] *Id.*

No. 17-30469

(1) the government agents have a legitimate law enforcement purpose for being in the house; (2) the sweep is supported by a reasonable, articulable suspicion that the area to be swept harbors an individual posing a danger to those on the scene; (3) the sweep is no more than a cursory inspection of those spaces where a person may be found; and (4) the sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and lasts no longer than the police are justified in remaining on the premises.

*Mendez*, 431 F.3d at 428 (cleaned up).[31]

Assuming *arguendo* that the protective sweep was proper,[32] such a sweep would not and did not result in finding the rifle. It was neither in plain sight nor hiding in a place "where a person may be found."[33] The officer who discovered the rifle testified that it was located in a place he did not look initially because it was not somewhere a person could hide.[34]

But the government points out that, in a signed factual basis, Lim admitted that the rifle was in plain view in the laundry room.[35] Lim responds that the statement was plainly contradicted by the officer who found the rifle. Neither side cites authority on whether we must credit a signed factual basis that is plainly contradicted by the record.[36]

---

[31] *See Blevins*, 755 F.3d at 326. ("The officers, not knowing what or who was inside, reasonably performed a protective sweep.").

[32] *See id.* at 325 ("After entering the residence, the authorities may conduct a limited search for their own protection.").

[33] The pistol likewise would not have been admissible under this theory, as it also was not in plain sight or in a location where someone could be hiding—it was located on a shelf, under clothes, wrapped in underwear.

[34] The officer testified that the rifle was wedged between the wall and the washer and dryer. In fact, he explained that one of the children had to describe exactly where it was before he could locate it.

[35] The factual basis states, "[O]fficers discovered a Marlin Model 6082, .22 caliber rifle in plain view in the laundry room."

[36] We know of only one case—unpublished—noting that "whether a contradictory

19

No. 17-30469

Typically, we hold defendants to their signed admissions.[37] We are reviewing, however, whether the decision to deny the motion to suppress was erroneous. The district court ruled on that motion before entry of the guilty plea, so the court had the testimony but not the factual basis. Though a defendant can concede a disputed fact in a factual basis, Lim reserved his right to appeal the suppression decision and withdraw the guilty plea in the event he is victorious.[38] And, the government's own witness testified to a contradictory set of facts. We will not allow the government to avoid its own evidence and rely on a craftily worded factual basis to justify a potentially unconstitutional search. A protective sweep cannot support the validity of the search that located the rifle.[39]

The government posits that Lim consented to a search for the weapons. In its brief on appeal, the government is less than clear on exactly how Lim consented. It notes that Lim consented to the officer's entering the house, but it largely leaves the rest of the dots unconnected.[40] Lim rightly points out, however, that consent to enter does not equate with consent to search.

"The standard for measuring the scope of a suspect's consent under the

---

stipulation can negate a factual basis that is otherwise sufficient. . . is an issue of first impression," but not deciding the question because review was for plain error. *See United States v. Estrada*, 486 F. App'x 441, 443 (5th Cir. 2012) (per curiam).

[37] *See Blackledge v. Allison*, 431 U.S. 63, 74 (1977) ("Solemn declarations in open court carry a strong presumption of verity.").

[38] A defendant who enters a conditional plea and "prevail[s] on appeal may then withdraw the plea." FED. R. CRIM. P. 11(a)(2).

[39] *See Blevins*, 755 F.3d at 325 ("Evidence found in plain view of the officers while they are conducting their security sweep is admissible, but evidence recovered beyond the scope of the protective sweep is not.").

[40] At one point, the government asserted that Lim "consented to the protective sweep." As explained above, a valid protective sweep would not and did not result in the discovery of the weapons.

No. 17-30469

Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). "[F]actual circumstances are highly relevant when determining what the reasonable person would have believed to be the outer bounds of the consent that was given." *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 667 (5th Cir. 2003).

A reasonable observer would conclude that Lim's initial consent to enter the house extended only to accompanying him to dress and was not *carte blanche* approval to search. Therefore, the searches were not within the scope of Lim's initial consent.

And Lim did not at any point affirmatively consent to a search.[41] Though he answered the questions about the presence and location of the weapons, agreeing that weapons are present does not equate to agreeing to a search for those weapons. Thus, the rifle was the product of an unlawful search and should have been suppressed.

## C.

Lim invokes the Fifth Amendment to suppress both his answers to the officers' questions and the weapons. He claims the officers violated his Fifth Amendment rights by questioning him before any *Miranda* warnings. The government largely ignores the Fifth Amendment contention in its brief on appeal, so we rely heavily on its response to the motion in the district court.

"*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc).

---

[41] Again, we emphasize that even assuming Lim consented to a protective sweep, that sweep did not result in the discovery of the rifle.

No. 17-30469

A person is "'in custody' for *Miranda* purposes when placed under formal arrest." *Id.* at 596. There is no dispute that Lim was placed under formal arrest before the questioning, nor is it disputed that he was not given *Miranda* warnings until after the initial questioning. Importantly, the questioning officer bragged that it was his standard policy not to *Mirandize* an alien until after it appeared that criminal charges might be filed.

In the district court, the government asserted that the public safety exception to *Miranda* applied to admit Lim's pre-*Miranda* responses. As for Lim's one post-*Miranda* response, the government contended that Lim voluntarily waived his *Miranda* rights.

### 1. Pre-*Miranda* Responses

"The public safety exception to *Miranda* allows the admission as evidence of statements given by a defendant before being given *Miranda* warnings when 'a situation posing a threat to the public safety' exists."[42] The exception is "narrow" and "circumscribed by the exigency which justifies it."[43] We refused to apply the exception where the police had already swept the house twice, the occupants were secure, the "immediacy of the situation had passed," and "[t]he public did not have access to [the defendant's] private residence."[44]

---

[42] *United States v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006) (quoting *New York v. Quarles*, 467 U.S. 649, 655–60 (1984)).

[43] *Id.* (quotation marks omitted).

[44] *Id. Compare United States v. Green*, 388 F. App'x 375, 379–80 (5th Cir. 2010) (per curiam) (explaining in *dictum* that "the facts of this case hardly suggest the conditions of exigency that justify the application of the exception" where the officers asked about the presence of guns in a motel room before providing *Miranda* warnings because the defendant was placed under arrest outside of the room, no specific public threat existed, and the officers had time to administer the warnings prior to entering the motel room), *and United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989) ("Unlike the situation in *Quarles*, however, when the gun was hidden in a place to which the public had access, Raborn's truck, where the police

No. 17-30469

Here, the officers either were in the process of conducting a protective sweep or had not yet performed one when Lim was questioned.  There was no concern for the general safety of the public, given that the public did not have access to Lim's residence, and no violent crime had immediately preceded the arrest.  The best theory for application of the public safety exception thus rests on concern for the officer's own safety.

But the exception, as first articulated in *Quarles*, is narrowly drawn to allow officers to react to emergencies where "spontaneity rather than adherence to a police manual is necessar[y]."[45]  The officers had formally arrested

---

officers believed the gun to be, had already been seized and only the police officers had access to the truck."), *with Fleming v. Collins*, 954 F.2d 1109, 1112–14 (5th Cir. 1992) (en banc) (finding the public safety exception met where officers responding to a bank robbery placed in custody two men who were found wrestling near the bank and one of the men, the defendant, was shot, and the officers immediately asked who shot him and where the gun was located), *United States v. Webster*, 162 F.3d 308, 332 (5th Cir. 1998) ("[T]he police acted constitutionally when they asked Webster whether he had any needles in his pockets that could injure them during their pat down; such questioning[ is] needed to protect the officers."), *United States v. Roberson*, 20 F.3d 1171, 1171 (5th Cir. 1994) ("After discovering the knife in Roberson's back pocket, the arresting officer was justified in his inquiry about additional weapons, and both the gun and Roberson's response to the officer's inquiry were admissible under *Quarles*."), *United States v. Kelley,* 268 F. App'x 304, 305 (5th Cir. 2008) (per curiam) ("Because the officer's question was based on his concern about the safety of the officers on the scene and before the officers had completed a protective sweep of the residence, the district court did not err in denying Kelley's motion to suppress."), *United States v. Lee*, 188 F. App'x 326, 328 (5th Cir. 2006) (per curiam) (finding the public safety exception met where, after being arrested, the defendant voluntarily and spontaneously asked if the officers were looking for his gun, the officers questioned the defendant about the location of the gun before they *Mirandized* him because the "questions were based on [a] concern about the safety of the officers at the scene and the numerous onlookers"), *and United States v. Munera-Uribe*, 192 F.3d 126, 126 (5th Cir. 1999) (unpublished) ("[P]olice may dispense with *Miranda* warnings when necessary for their protection. . . . The dangers that law enforcement officials face from drug dealers and the like are well known, and it was important for the officers to identify precisely the apartment in which Munera's cohorts could be found.").

[45] *Quarles*, 467 U.S. at 656–57 ("The police in this case, in the very act of apprehending a suspect, were confronted with the *immediate necessity* of ascertaining the whereabouts of a gun which they had every reason to believe *the suspect had just removed* from his empty holster and discarded in the supermarket." (emphasis added)).

23

No. 17-30469

Lim *outside* his house, so he was fully within their control. The officers and Lim then jointly agreed to enter the home. There is no indication why the officers could not take a moment to provide *Miranda* warnings before entering.[46] "They obviously had ample time to do so without incurring any risk to themselves or to the public, and without jeopardizing their mission."[47] This case does not raise the type of emergency, volatile situation that the public safety exception is designed to serve.

Lim's pre-*Miranda* answers should have been excluded. We reverse the district court's denial of the motion to suppress these answers and remand to give Lim the option to withdraw his guilty plea on remand.[48]

### 2. The Weapons

The guns located as a result of the *Miranda* violation do not need to be excluded under the Fifth Amendment. "'Introduction of the nontestimonial fruit of a voluntary statement . . . does not implicate the Self–Incrimination Clause. The admission of such fruit presents no risk that a defendant's coerced statements . . . will be used against him at a criminal trial.'"[49] "Because the exclusion of unwarned statements . . . is a complete and sufficient remedy for any perceived *Miranda* violation, any such fruit need not be suppressed.[50]

---

[46] *See Green*, 388 F. App'x at 380 ("The government does not explain . . . *why* they failed to *Mirandize* Green . . . before they approached and entered the motel room.").

[47] *Id.*

[48] *See Brathwaite*, 458 F.3d at 383–84; FED. R. CRIM. P. 11(a)(2).

[49] *Brathwaite*, 458 F.3d at 382 n.7 (quoting *United States v. Patane*, 542 U.S. 630, 643 (2004) (plurality opinion)). Given the totality of the circumstances and the standard of review, we find his responses voluntary. *See United States v. Mendez*, 885 F.3d 899, 910 (5th Cir. 2018)*; Green*, 388 F. App'x at 381 (citing *Elstad*, 470 U.S. at 310).

[50] *Id.* (cleaned up); *see also Patane*, 542 U.S. at 645 (Kennedy, J., concurring) ("Admission of nontestimonial physical fruits . . . does not run the risk of admitting into trial an

No. 17-30469

### 3. Post-*Miranda* Response

After the officers located the pistol in the bedroom, they administered *Miranda* warnings. Lim then answered an officer's question about where he had obtained the pistol. Lim claims that answer should additionally be suppressed "because it relies on the illegally obtained pre-*Miranda* information, and incorporates that information into the question" and essentially "forced Mr. Lim to acknowledge his pre-*Miranda* statements." In the district court, the government responded that Lim voluntarily waived his *Miranda* rights by answering the question.

The decision in *Missouri v. Seibert*, 542 U.S. 600, 621 (2004), "requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken; where that strategy is not used, the admissibility of postwarning statements continues to be governed by the principles of" *Oregon v. Elstad*, 470 U.S. 296 (1985). *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006) (cleaned up). *Elstad* "allow[s] a post-warning confession even where the police had previously obtained a pre-warning confession, so long as the pre-warning confession was voluntary." *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007).

We first review whether a "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."[51] Though the questioning officer admitted it was his practice in these cases not to *Mirandize* arrestees right away, he explained that he had that policy because the cases against

---

accused's coerced incriminating statements against himself."); *Chavez v. Martinez*, 538 U.S. 760, 790 (2003).

[51] *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in judgment). *See also Courtney*, 463 F.3d at 338 ("Therefore, we find *Seibert*'s holding in Justice Kennedy's opinion concurring in the judgment."); *Nunez-Sanchez*, 478 F.3d at 668.

these arrestees were completed, so he is not investigating or attempting to elicit incriminating responses. "[N]othing in the circumstances or the nature of the questioning . . . indicate . . . coercion" or "a deliberate attempt to employ a two-step strategy." *Nunez-Sanchez*, 478 F.3d at 668. "All evidence suggests that [Lim] was calm and cooperative, and the agents did not act with aggressiveness or hostility." *See id.* at 668–69.

We then turn to the *Elstad* inquiry, under which we review "whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id.* at 669 (quoting *Elstad*, 470 U.S. at 318). "[A] statement is involuntary . . . if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are 'so offensive to a civilized system of justice that they must be condemned.'" *Hernandez*, 200 F. App'x at 287 (quoting *Bengivenga*, 845 F.2d at 601). "In cases such as this, a subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Nunez-Sanchez*, 478 F.3d at 669 (cleaned up).

Nothing in the circumstances surrounding Lim's post-*Miranda* statements suggests he was coerced. In fact, after answering the first post-*Miranda* question, Lim felt comfortable enough to invoke his right to remain silent and refuse to answer any further questions. His single post-*Miranda* answer is admissible.

No. 17-30469

## VI.

As we have explained, the result is mixed.  The denial of motions to dismiss the indictment and to allow evidence of Lim's immigration status is AFFIRMED.  The denial of the motion to suppress is AFFIRMED in part and REVERSED in part:  The denial of motions to suppress evidence of the pistol located in the bedroom and to suppress the post-*Miranda* response is AFFIRMED; the denial of the motion to suppress evidence of the rifle in the laundry room and of the pre-*Miranda* responses is REVERSED.  The judgment of conviction is therefore VACATED and REMANDED for further proceedings as needed.