# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 7, 2022

Lyle W. Cayce
Clerk

No. 21-50283

United States of America,

*Plaintiff—Appellee*,

*versus*

Luis Fernandez,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:20-CR-130-1

Before Stewart, Elrod, and Graves, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

A grand jury indicted Luis Fernandez for being an unlawful user of a controlled substance in possession of a firearm. The indictment stemmed from an incident in Odessa, Texas, in which Fernandez drove to a police station while in possession of a rifle, and eventually confessed to having recently used cocaine. Fernandez moved to suppress the statements he made to the police. The district court granted Fernandez's motion to suppress in part and denied it in part. At a bench trial, the district court found Fernandez guilty and later sentenced him to a within-guidelines term of 10 months of

No. 21-50283

imprisonment and three years of supervised release. For the reasons that follow, we AFFIRM the judgment.

## I. Facts & Procedural History

Around 1:38 p.m. on May 29, 2020, while driving to the Odessa Police Department ("OPD"), Fernandez called 911 claiming that he was armed and being chased by multiple people. Corporal Ian Kapets and Detective Donny Rocha ran from inside the OPD building to the parking lot, where they observed Fernandez pulling halfway into a parking space while holding both of his hands out of his truck's window. Rocha approached Fernandez and observed a firearm in his lap. Rocha removed the firearm, and Kapets pulled Fernandez out of his truck and patted him down.

Officer Yolanda Medrano responded to the scene in her patrol vehicle, arriving around 1:41 p.m. When she arrived, Rocha stated that he did not know what was going on, only that Fernandez had claimed he was being chased and was in possession of a firearm. Medrano then approached Fernandez, who was not handcuffed or otherwise restrained, and Kapets asked, "So what's going on, like, can you walk me through who's chasing you and all that stuff?" Fernandez responded only that "they" were following him.

Kapets then asked Fernandez whether there was anything illegal in his truck, and Fernandez replied that his truck had already been searched by sheriff's deputies he had encountered on the way to the police station. Kapets requested permission to search the truck, but Fernandez again referred to the sheriff's deputies having already searched it. At that point, Medrano directed Fernandez to sit on the ground. Kapets then asked him, "Did you use any sort of drugs? I mean, be honest with me. I'm just trying to figure out what's going on here." Fernandez replied, "I been drinking, and yeah, I used cocaine." Fernandez explained that he had used cocaine the night before to

stay awake because he feared that unidentified people were going to get him. Kapets and the other officers then encouraged Fernandez to light his cigarette so that he could calm down and they could help him if he was, in fact, being chased.

Kapets, Fernandez, and another officer continued to speak as Medrano spoke with other officers on scene and peered into the truck. At one point, Rocha stated to Medrano that "[Fernandez] used coke, so he's intoxicated with a firearm." Pieces of Fernandez's conversation can be heard in the background of the bodycam video for about the next minute. Fernandez stated that he had "just a beer earlier" that day. One of the officers replied that "something" was going on, possibly "more drugs." An officer asked Fernandez to remove his sunglasses so that he could see Fernandez's eyes, which the officer described as "like olives, they're giant." Fernandez's mouth was also dry, as if he had "cotton mouth."

About two minutes later, Kapets asked Fernandez where he got his cocaine from. Fernandez did not explicitly answer, but he clarified that his truck did not contain any additional cocaine or paraphernalia. Kapets, Rocha, and Medrano began to discuss what crime they might charge Fernandez with and whether they would inventory search his vehicle. The officers initially appeared to settle on charging Fernandez with a DWI, but Rocha brought up the possibility that Fernandez could be arrested for the federal offense of being a drug user in possession of a firearm.

While Kapets, Rocha, and Medrano discussed Fernandez's drug use and potential charges, Officer Tyler Thelen attempted to administer field sobriety tests to Fernandez. After Fernandez failed to complete a proper field sobriety test, he was handcuffed. Kapets approached Fernandez as he was being handcuffed and asked, "Are you addicted to cocaine?" and "How long have you used cocaine for?" Fernandez responded that he wanted to try

rehab; that he had used cocaine for "one month[], two months, five years, ten years, just recently"; and that he had used cocaine the past three days. Kapets then made a call to determine the requirements to charge a suspect with being a drug user in possession of a firearm. At around 1:52 p.m., Kapets stated, "I will probably *Mirandize* him and do a confession."

Meanwhile, Fernandez was placed in the back seat of Thelen's patrol vehicle. When someone opened the rear hatch of this vehicle, Fernandez requested to speak to that officer's supervisor. Sergeant Patrick Chadwick eventually opened the back door of the patrol vehicle and began to speak to Fernandez. Fernandez advised that he was in fear for his life from the cartel and that he could not say anything "out here." Chadwick and Fernandez spoke for a couple minutes about his story and Chadwick eventually stated that he wanted to "read [Fernandez] this," presumably referring to his *Miranda* rights. Fernandez interrupted and pleaded with Chadwick to "please understand" what was going on, referencing his wife in Mexico and his fear for his life.

At 2:00 p.m., Chadwick read Fernandez his *Miranda* rights. Fernandez confirmed that he understood his rights and stated that he would only discuss topics that would not get him in more trouble. Chadwick and Fernandez continued their conversation in the patrol vehicle. Fernandez repeated the information previously provided, including his place of residence, that he was being chased, that he encountered sheriff's deputies, that he had the rifle in the vehicle with him, where he purchased the firearm, and that the officers needed to speak with his wife. Chadwick asked Fernandez when he last used narcotics. Fernandez responded that he used cocaine the previous night, that he had not slept in two days, and that he used cocaine because he believed he was being chased. Chadwick repeated to Fernandez the reason for his arrest and continued to ask him why he believed he was being chased.

At roughly 2:20 p.m., Fernandez was removed from the patrol vehicle and placed in an interview room at OPD. Kapets entered the room and began questioning Fernandez after confirming that he had been *Mirandized*. As relevant here, Kapets asked Fernandez how long he had used cocaine for. Fernandez explained that he had used it sporadically recently, but he maintained that he was not an addict.

The district court granted in part and denied in part Fernandez's motion to suppress this evidence. Specifically, it ruled admissible those statements that Fernandez made before being handcuffed and those he made after being *Mirandized*. But it ordered suppressed those statements that Fernandez made while handcuffed through the time he received his *Miranda* warnings. Put differently, the district court suppressed the statements Fernandez made between 1:48 p.m. and 2:00 p.m.

Fernandez subsequently waived his right to a jury trial, and the parties agreed to a stipulated set of facts. The joint stipulation recognized that Fernandez reserved his right to appeal the suppression ruling. At a bench trial, the district court found Fernandez guilty as charged and later sentenced him to a within-guidelines term of 10 months of imprisonment and three years of supervised release. Fernandez timely appealed.

## II. Standard of Review

"When reviewing a denial of a motion to suppress evidence, this [c]ourt reviews factual findings for clear error and the ultimate constitutionality of law enforcement action de novo." *United States v. Robinson*, 741 F.3d 588, 594 (5th Cir. 2014). The evidence presented at a suppression hearing is viewed "in the light most favorable to the prevailing party." *United States v. Cervantes*, 797 F.3d 326, 328 (5th Cir. 2015) (quoting *United States v. Rodriguez*, 564 F.3d 735, 740 (5th Cir. 2009)). This court defers to the district court's factual findings unless there is "a definite and

firm conviction that a mistake has been committed." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010).

## III. Discussion

The Fifth Amendment provides that "[n]o person shall … be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Under *Miranda*, "the prosecution may not use statements stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *United States v. Bennett*, 626 F.2d 1309, 1311 (5th Cir. 1980) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)). "*Miranda* warnings must be administered prior to 'custodial interrogation.'" *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc). A person is "'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* at 596. To use an in-custody statement against the defendant, the government must establish that he was warned of his right to remain silent and his right to consult with an attorney. *See Miranda*, 384 U.S. at 471. A suspect in custody may waive the effectuation of his *Miranda* rights if the statement was made "voluntarily, knowingly and intelligently." *Id.* at 444.

Fernandez argues that the district court erroneously ruled that his post-*Miranda* statements were admissible because the police used a two-step, "question first" strategy forbidden under *Missouri v. Seibert*, 542 U.S. 600 (2004). He also challenges the district court's finding that the officers' failure to *Mirandize* him resulted from "innocent neglect." Allegedly, the officers' tactics were instead "driven solely by their desire to do an end run around *Miranda* and to set [him] up for a federal criminal prosecution." The

No. 21-50283

government counters that Fernandez's post-*Miranda* statements were admissible because they were voluntary and because the officers did not deliberately try to circumvent *Miranda*. It reasons that "the officers were dealing with an emergency situation in their own parking lot" and trying "to assess how best to proceed." It further argues that Fernandez's post-*Miranda* statements were not coerced because Kapets "never directly confronted [Fernandez] with his pre-warning statements," and Fernandez understood his right not to incriminate himself.

## A.

*Seibert* "requires the suppression of a post-warning statement only where a deliberate two-step strategy is used and no curative measures are taken." *United States v. Lim*, 897 F.3d 673, 692 (5th Cir. 2018) (quoting *United States v. Courtney*, 463 F.3d 333, 338 (5th Cir. 2006)). In other words, officers cannot employ "the two-step interrogation technique . . . in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).[1] "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Where officers did not deliberately employ a two-step strategy, *Oregon v. Elstad*, 470 U.S. 298 (1985), governs "the admissibility of postwarning statements." *Lim*, 897 F.3d at 692 (quoting *Courtney*, 463 F.3d at 338).

The district court held that the officers did not employ a deliberate two-step strategy. Rather, "[t]he series of events . . . unfolded quickly," and upon making contact with Fernandez, the "officers only knew that a man

---

[1] *See Courtney*, 463 F.3d at 338 ("[W]e find *Seibert*'s holding in Justice Kennedy's opinion concurring in the judgment.").

7

claiming he was being chased . . . was heading toward OPD with a firearm." According to the district court, this information "very quickly elicited panicked responses from the officers." For that reason, they "quickly disarmed [Fernandez] and questioned him to determine if there was any danger to the community or officers." Thus, based on the record, the district court determined that the officers had not "deliberately failed" to *Mirandize* Fernandez.

We agree with the district court. "There is no evidence of a deliberate attempt to employ a two-step strategy in this case." *United States v. Nunez-Sanchez*, 478 F.3d 663, 668 (5th Cir. 2007). For one, nothing about the circumstances or nature of the officers' initial questioning "indicate[s] that coercion or other improper tactics were used." *Id*. Other than his belief that he was being chased by cartel members, Fernandez "was calm and cooperative, and the [officers] did not act with aggressiveness or hostility." *Id*. Moreover, "confront[ing] the defendant with [his] inadmissible prewarning statements and push[ing] [him] to acknowledge them" would provide further evidence that the officers were using the two-step strategy "in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 621-22 (Kennedy, J., concurring in the judgment). Merely asking the defendant "about the same subjects pre- and post-*Miranda*" is not forbidden. *United States v. Gonzalez*, 814 F. App'x 838, 847 (5th Cir. 2020) (per curiam). Here, the record does not show that the officers confronted Fernandez with his prewarning statements to deliberately circumvent *Miranda*. Instead, they "merely responded to evidence" that they acquired while investigating Fernandez's claim that he was being chased. *Id*. In contrast, the post-warning interview in *Seibert* "resembled a cross-examination." *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment). Since the officers did not confront Fernandez with his prewarning

statements, and there is no other evidence of a deliberate attempt to employ a two-step strategy, *Seibert* does not apply.

### B.

Because officers did not employ the proscribed two-step strategy, *Elstad* controls the remainder of the analysis. *See Lim*, 897 F.3d at 692. *Elstad* permits "a post-warning confession even where the police had previously obtained a pre-warning confession, so long as the pre-warning confession was voluntary," and "the second statement was also voluntarily made." *Id.* (quoting *Nunez-Sanchez*, 478 F.3d at 668). In evaluating voluntariness, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect." *Elstad*, 470 U.S. at 318. "[A] statement is involuntary . . . if the tactics employed by law enforcement officials constitute a Fifth Amendment due process violation and are so offensive to a civilized system of justice that they must be condemned." *Lim*, 897 F.3d at 692 (quotation omitted). "A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement" will ordinarily "remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314.

The district court held that after Fernandez was *Mirandized* at 2:00 p.m., he made incriminating statements regarding his drug use at roughly 2:04 p.m. (in the patrol vehicle) and 2:34 p.m. (in the interrogation room). It explained that the circumstances of Fernandez's conversations with Chadwick and Kapets "establish [Fernandez] knew his rights, including his right to remain silent, on both occasions," and he nonetheless "knowingly chose to waive them." Therefore, the district court concluded that Fernandez's post-warning statements were a product of his "free and rational choice" and admissible.

In his appellate brief, Fernandez does not challenge the voluntariness of his pre-arrest statements, nor does he argue that his post-warning statements were involuntary. At oral argument, however, he argued for the first time that he could not have knowingly and voluntarily waived his *Miranda* rights because he was "delusional." But Fernandez conceded at oral argument that voluntariness was not the "thrust" of his brief before the district court. He also reiterated that the "heart of [his] case" instead concerns whether there was a "deliberate attempt" to employ the two-step process that *Seibert* prohibits. Generally, "arguments not raised before the district court are waived and will not be considered on appeal." *Celanese Corp. v. Martin K. Eby Const. Co.*, 620 F.3d 529, 531 (5th Cir. 2010). And "[f]ailure adequately to brief an issue on appeal constitutes waiver of that argument." *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004). That applies where, as here, a party "fail[s] to raise [an argument] in its opening brief." *Id.* Thus, any argument concerning voluntariness is waived. We affirm the district court's judgment.

## IV. Conclusion

For the foregoing reasons, the judgment is AFFIRMED.